UNITED STATES *v.* BAILEY ET AL.

No. 78–990.   Argued November 7, 1979—Decided January 21, 1980*

---

*Together with *United States* v. *Cogdell,* also on certiorari to the same court (see this Court's Rule 23 (5)).

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Powell, and Stevens, JJ., joined. Stevens, J., filed a concurring opinion, *post*, p. 417. Blackmun, J., filed a dissenting opinion, in which Brennan, J., joined, *post*, p. 419. Marshall, J., took no part in the consideration or decision of the cases.

*Edwin S. Kneedler* argued the cause for the United States. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Heymann, Kenneth S. Geller, Jerome M. Feit*, and *John DePue*.

*Richard S. Kohn* argued the cause for respondents. With him on the brief were *John Townsend Rich, Robert A. Robbins, Jr.*, and *Dorothy Sellers*.

Mr. Justice Rehnquist delivered the opinion of the Court.

In the early morning hours of August 26, 1976, respondents Clifford Bailey, James T. Cogdell, Ronald C. Cooley, and Ralph Walker, federal prisoners at the District of Columbia jail, crawled through a window from which a bar had been removed, slid down a knotted bedsheet, and escaped from custody. Federal authorities recaptured them after they had remained at large for a period of time ranging from one month to three and one-half months. Upon their apprehension, they were charged with violating 18 U. S. C. § 751 (a), which governs escape from federal custody.[1] At their trials, each of the

---

[1] Title 18 U. S. C. § 751 (a) provides:

"Whoever escapes or attempts to escape from the custody of the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General, or from any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or magistrate, or from the custody of an officer or employee of the United States pursuant to lawful

respondents adduced or offered to adduce evidence as to various conditions and events at the District of Columbia jail, but each was convicted by the jury. The Court of Appeals for the District of Columbia Circuit reversed the convictions by a divided vote, holding that the District Court had improperly precluded consideration by the respective juries of respondents' tendered evidence. We granted certiorari, 440 U. S. 957, and now reverse the judgments of the Court of Appeals.

In reaching our conclusion, we must decide the state of mind necessary for violation of § 751 (a) and the elements that constitute defenses such as duress and necessity. In explaining the reasons for our decision, we find ourselves in a position akin to that of the mother crab who is trying to teach her progeny to walk in a straight line, and finally in desperation exclaims: "Don't do as I do, do as I say." The Act of Congress we construe consists of one sentence set forth in the margin, n. 1, *supra;* our own pragmatic estimate, expressed *infra,* at 417, is that "[i]n general, trials for violations of § 751 (a) should be simple affairs." Yet we have written, reluctantly but we believe necessarily, a somewhat lengthy opinion supporting our conclusion, because in enacting the Federal Criminal Code Congress legislated in the light of a long history of case law that is frequently relevant in fleshing out the bare bones of a crime that Congress may have proscribed in a single sentence. See *Morissette* v. *United States,* 342 U. S. 246 (1952).

---

arrest, shall, if the custody or confinement is by virtue of an arrest on a charge of felony, or conviction of any offense, be fined not more than $5,000 or imprisoned not more than five years, or both; or if the custody or confinement is for extradition or by virtue of an arrest or charge of or for a misdemeanor, and prior to conviction, be fined not more than $1,000 or imprisoned not more than one year, or both."

Respondents were also charged with violating 22 D. C. Code § 2601 (1973), the District of Columbia's statute proscribing escape from prison. The District Court instructed the juries that if they found the respondents guilty of violating 18 U. S. C. § 751 (a) they should not consider the charges under 22 D. C. Code § 2601.

I

All respondents requested jury trials and were initially scheduled to be tried jointly. At the last minute, however, respondent Cogdell secured a severance. Because the District Court refused to submit to the jury any instructions on respondents' defense of duress or necessity and did not charge the jury that escape was a continuing offense, we must examine in some detail the evidence brought out at trial.

The prosecution's case in chief against Bailey, Cooley, and Walker was brief. The Government introduced evidence that each of the respondents was in federal custody on August 26, 1976, that they had disappeared, apparently through a cell window, at approximately 5:35 a. m. on that date, and that they had been apprehended individually between September 27 and December 13, 1976.

Respondents' defense of duress or necessity centered on the conditions in the jail during the months of June, July, and August 1976, and on various threats and beatings directed at them during that period. In describing the conditions at the jail, they introduced evidence of frequent fires in "Northeast One," the maximum-security cellblock occupied by respondents prior to their escape. Construed in the light most favorable to them, this evidence demonstrated that the inmates of Northeast One, and on occasion the guards in that unit, set fire to trash, bedding, and other objects thrown from the cells. According to the inmates, the guards simply allowed the fires to burn until they went out. Although the fires apparently were confined to small areas and posed no substantial threat of spreading through the complex, poor ventilation caused smoke to collect and linger in the cellblock.

Respondents Cooley and Bailey also introduced testimony that the guards at the jail had subjected them to beatings and to threats of death. Walker attempted to prove that he was an epileptic and had received inadequate medical attention for his seizures.

Consistently during the trial, the District Court stressed that, to sustain their defenses, respondents would have to introduce some evidence that they attempted to surrender or engaged in equivalent conduct once they had freed themselves from the conditions they described. But the court waited for such evidence in vain. Respondent Cooley, who had eluded the authorities for one month, testified that his "people" had tried to contact the authorities, but "never got in touch with anybody." App. 119. He also suggested that someone had told his sister that the Federal Bureau of Investigation would kill him when he was apprehended.

Respondent Bailey, who was apprehended on November 19, 1976, told a similar story. He stated that he "had the jail officials called several times," but did not turn himself in because "I would still be under the threats of death." Like Cooley, Bailey testified that "the FBI was telling my people that they was going to shoot me." *Id.*, at 169, 175–176.

Only respondent Walker suggested that he had attempted to negotiate a surrender. Like Cooley and Bailey, Walker testified that the FBI had told his "people" that they would kill him when they recaptured him. Nevertheless, according to Walker, he called the FBI three times and spoke with an agent whose name he could not remember. That agent allegedly assured him that the FBI would not harm him, but was unable to promise that Walker would not be returned to the D. C. jail. *Id.*, at 195–200.[2] Walker testified that he last called the FBI in mid-October. He was finally apprehended on December 13, 1976.

At the close of all the evidence, the District Court rejected respondents' proffered instruction on duress as a defense to

---

[2] On rebuttal, the prosecution called Joel Dean, the FBI agent who had been assigned to investigate Walker's escape in August 1976. He testified that, under standard Bureau practice, he would have been notified of any contact made by Walker with the FBI. According to Dean, he never was informed of any such contact. App. 203–204.

prison escape.[3]  The court ruled that respondents had failed as a matter of law to present evidence sufficient to support such a defense because they had not turned themselves in after they had escaped the allegedly coercive conditions. After receiving instructions to disregard the evidence of the conditions in the jail, the jury convicted Bailey, Cooley, and Walker of violating § 751 (a).

Two months later, respondent Cogdell came to trial before the same District Judge who had presided over the trial of his co-respondents.  When Cogdell attempted to offer testimony concerning the allegedly inhumane conditions at the D. C. jail, the District Judge inquired into Cogdell's conduct between his escape on August 26 and his apprehension on September 28.  In response to Cogdell's assertion that he "may have written letters," the District Court specified that Cogdell could testify only as to "what he did . . . [n]ot what he may have done."  App. 230.  Absent such testimony, however, the District Court ruled that Cogdell could not present evidence of conditions at the jail.  Cogdell subsequently chose not to testify on his own behalf, and was convicted by the jury of violating § 751 (a).

By a divided vote, the Court of Appeals reversed each respondent's conviction and remanded for new trials.  See 190 U. S. App. D. C. 142, 585 F. 2d 1087 (1978); 190 U. S.

---

[3] Respondents asked the District Court to give the following instruction:

"Coercion which would excuse the commission of a criminal act must result from:

"1) Threathening [sic] conduct sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm;

"2) The conduct in fact caused such fear of death or serious bodily harm in the mind of the defendant;

"3) The fear or duress was operating upon the mind of the defendant at the time of the alleged act; and

"4) The defendant committed the act to avoid the threathened [sic] harm."

App. D. C. 185, 585 F. 2d 1130 (1978). The majority concluded that the District Court should have allowed the jury to consider the evidence of coercive conditions in determining whether the respondents had formulated the requisite intent to sustain a conviction under § 751 (a). According to the majority, § 751 (a) required the prosecution to prove that a particular defendant left federal custody voluntarily, without permission, and "with an intent to avoid confinement." 190 U. S. App. D. C., at 148, 585 F. 2d, at 1093. The majority then defined the word "confinement" as encompassing only the "normal aspects" of punishment prescribed by our legal system. Thus, where a prisoner escapes in order to avoid "non-confinement" conditions such as beatings or homosexual attacks, he would not necessarily have the requisite intent to sustain a conviction under § 751 (a). According to the majority:

> "When a defendant introduces evidence that he was subject to such 'non-confinement' conditions, the crucial factual determination on the intent issue is . . . whether the defendant left custody only to avoid these conditions or whether, in addition, the defendant *also* intended to avoid confinement. In making this determination the jury is to be guided by the trial court's instructions pointing out those factors that are most indicative of the presence or absence of an intent to avoid confinement." 190 U. S. App. D. C., at 148, n. 17, 585 F. 2d, at 1093, n. 17 (emphasis in original).

Turning to the applicability of the defense of duress or necessity, the majority assumed that escape as defined by § 751 (a) was a "continuing offense" as long as the escapee was at large. Given this assumption, the majority agreed with the District Court that, under normal circumstances, an escapee must present evidence of coercion to justify his continued absence from custody as well as his initial departure. Here, however, respondents had been indicted for "flee[ing]

and escap[ing]" "[o]n or about August 26, 1976," and not for "leaving *and staying away from* custody." 190 U. S. App. D. C., at 155, 585 F. 2d, at 1100 (emphasis in original). Similarly, "[t]he trial court's instructions when read as a whole clearly give the impression that [respondents] were being tried only for leaving the jail on August 26, and not for failing to return at some later date." *Id.,* at 155, n. 50, 585 F. 2d, at 1100, n. 50. Under these circumstances, the majority believed that neither respondents nor the juries were acquainted with the proposition that the escapes in question were continuing offenses. This failure, according to the majority, constituted "an obvious violation of [respondents'] constitutional right to jury trial." *Id.,* at 156, 585 F. 2d, at 1101.

The dissenting judge objected to what he characterized as a revolutionary reinterpretation of criminal law by the majority. He argued that the common-law crime of escape had traditionally required only "general intent," a mental state no more sophisticated than an "intent to go beyond permitted limits." *Id.,* at 177, 585 F. 2d, at 1122 (emphasis deleted). The dissent concluded that the District Court had properly removed from consideration each respondent's contention that conditions and events at the D. C. jail justified his escape, because each respondent had introduced no evidence whatsoever justifying his continued absence from jail following that escape.

## II

Criminal liability is normally based upon the concurrence of two factors, "an evil-meaning mind [and] an evil-doing hand. . . ." *Morissette* v. *United States,* 342 U. S., at 251. In the present case, we must examine both the mental element, or *mens rea,* required for conviction under § 751 (a) and the circumstances under which the "evil-doing hand" can avoid liability under that section because coercive conditions or necessity negates a conclusion of guilt even though the necessary *mens rea* was present.

## A

Few areas of criminal law pose more difficulty than the proper definition of the *mens rea* required for any particular crime. In 1970, the National Commission on Reform of Federal Criminal Laws decried the "confused and inconsistent ad hoc approach" of the federal courts to this issue and called for "a new departure." See 1 Working Papers of the National Commission on Reform of Federal Criminal Laws 123 (hereinafter Working Papers). Although the central focus of this and other reform movements has been the codification of workable principles for determining criminal culpability, see, *e. g.*, American Law Institute, Model Penal Code §§ 2.01–2.13 (Prop. Off. Draft 1962) (hereinafter Model Penal Code); S. 1, 94th Cong., 2d Sess., §§ 301–303 (1976), a byproduct has been a general rethinking of traditional *mens rea* analysis.

At common law, crimes generally were classified as requiring either "general intent" or "specific intent." This venerable distinction, however, has been the source of a good deal of confusion. As one treatise explained:

> "Sometimes 'general intent' is used in the same way as 'criminal intent' to mean the general notion of *mens rea*, while 'specific intent' is taken to mean the mental state required for a particular crime. Or, 'general intent' may be used to encompass all forms of the mental state requirement, while 'specific intent' is limited to the one mental state of intent. Another possibility is that 'general intent' will be used to characterize an intent to do something on an undetermined occasion, and 'specific intent' to denote an intent to do that thing at a particular time and place." W. LaFave & A. Scott, Handbook on Criminal Law § 28, pp. 201–202 (1972) (footnotes omitted) (hereinafter LaFave & Scott).

This ambiguity has led to a movement away from the traditional dichotomy of intent and toward an alternative analysis of *mens rea*. See *id.*, at 202. This new approach, exemplified

in the American Law Institute's Model Penal Code, is based on two principles. First, the ambiguous and elastic term "intent" is replaced with a hierarchy of culpable states of mind. The different levels in this hierarchy are commonly identified, in descending order of culpability, as purpose, knowledge, recklessness, and negligence.[4] See LaFave & Scott 194; Model Penal Code § 2.02. Perhaps the most significant, and most esoteric, distinction drawn by this analysis is that between the mental states of "purpose" and "knowledge." As we pointed out in *United States* v. *United States Gypsum Co.,* 438 U. S. 422, 445 (1978), a person who causes a particular result is said to act purposefully if " 'he consciously desires that result, whatever the likelihood of that result happening from his conduct,' " while he is said to act knowingly if he is aware " 'that that result is practically certain to follow from his conduct, whatever his desire may be as to that result.' "[5]

In the case of most crimes, "the limited distinction between knowledge and purpose has not been considered important since 'there is good reason for imposing liability whether the defendant desired or merely knew of the practical certainty of the results.' " *United States* v. *United States Gypsum Co.,* supra, at 445, quoting LaFave & Scott 197. Thus, in *Gypsum* we held that a person could be held criminally liable under § 1 of the Sherman Act if that person exchanged price

---

[4] This hierarchy does not attempt to cover those offenses where criminal liability is imposed in the absence of any *mens rea* whatsoever. Such "strict liability" crimes are exceptions to the general rule that criminal liability requires an "evil-meaning mind." Compare *Morissette* v. *United States,* 342 U. S. 246, 250–263 (1952), with *United States* v. *Dotterweich,* 320 U. S. 277, 280–281, 284 (1943). Under the Model Penal Code, the only offenses based on strict liability are "violations," actions punishable by a fine, forfeiture, or other civil penalty rather than imprisonment. See Model Penal Code § 2.05 (1) (a). See also LaFave & Scott 218–223.

[5] Quoting *id.,* at 196.

information with a competitor either with the knowledge that the exchange would have unreasonable anticompetitive effects or with the purpose of producing those effects. 438 U. S., at 444–445, and n. 21.

In certain narrow classes of crimes, however, heightened culpability has been thought to merit special attention. Thus, the statutory and common law of homicide often distinguishes, either in setting the "degree" of the crime or in imposing punishment, between a person who knows that another person will be killed as the result of his conduct and a person who acts with the specific purpose of taking another's life. See LaFave & Scott 196–197. Similarly, where a defendant is charged with treason, this Court has stated that the Government must demonstrate that the defendant acted with a purpose to aid the enemy. See *Haupt* v. *United States,* 330 U. S. 631, 641 (1947). Another such example is the law of inchoate offenses such as attempt and conspiracy, where a heightened mental state separates criminality itself from otherwise innocuous behavior. See Model Penal Code § 2.02, Comments, p. 125 (Tent. Draft No. 4, 1955) (hereinafter MPC Comments).

In a general sense, "purpose" corresponds loosely with the common-law concept of specific intent, while "knowledge" corresponds loosely with the concept of general intent. See *ibid.;* LaFave & Scott 201–202. Were this substitution of terms the only innovation offered by the reformers, it would hardly be dramatic. But there is another ambiguity inherent in the traditional distinction between specific intent and general intent. Generally, even time-honored common-law crimes consist of several elements, and complex statutorily defined crimes exhibit this characteristic to an even greater degree. Is the same state of mind required of the actor for each element of the crime, or may some elements require one state of mind and some another? In *United States* v. *Feola,* 420 U. S. 671 (1975), for example, we were asked to decide

whether the Government, to sustain a conviction for assaulting a federal officer under 18 U. S. C. § 111, had to prove that the defendant knew that his victim was a federal officer. After looking to the legislative history of § 111, we concluded that Congress intended to require only "an intent to assault, not an intent to assault a federal officer." 420 U. S., at 684. What *Feola* implied, the American Law Institute stated: "[C]lear analysis requires that the question of the kind of culpability required to establish the commission of an offense be faced separately with respect to each material element of the crime." MPC Comments 123. See also Working Papers 131; LaFave & Scott 194.

Before dissecting § 751 (a) and assigning a level of culpability to each element, we believe that two observations are in order. First, in performing such analysis courts obviously must follow Congress' intent as to the required level of mental culpability for any particular offense. Principles derived from common law as well as precepts suggested by the American Law Institute must bow to legislative mandates. In the case of § 751 (a), however, neither the language of the statute nor the legislative history mentions the *mens rea* required for conviction.[6]

Second, while the suggested element-by-element analysis is a useful tool for making sense of an otherwise opaque concept, it is not the only principle to be considered. The administration of the federal system of criminal justice is confided to ordinary mortals, whether they be lawyers, judges, or jurors. This system could easily fall of its own weight if courts or

---

[6] This omission does not mean, of course, that § 751 (a) defines a "strict liability" crime for which punishment can be imposed without proof of any *mens rea* at all. As we held in *Morissette* v. *United States, supra,* at 263, "mere omission [from the statute] of any mention of intent will not be construed as eliminating that element from the crimes denounced." See also *United States* v. *United States Gypsum Co.,* 438 U. S. 422, 437 (1978).

scholars become obsessed with hair-splitting distinctions, either traditional or novel, that Congress neither stated nor implied when it made the conduct criminal.

As relevant to the charges against Bailey, Cooley, and Walker, § 751 (a) required the prosecution to prove (1) that they had been in the custody of the Attorney General, (2) as the result of a conviction, and (3) that they had escaped from that custody. As for the charges against respondent Cogdell, § 751 (a) required the same proof, with the exception that his confinement was based upon an arrest for a felony rather than a prior conviction. Although § 751 (a) does not define the term "escape," courts and commentators are in general agreement that it means absenting oneself from custody without permission. See, e. g., 190 U. S. App. D. C., at 148, 585 F. 2d, at 1093; id., at 177, 585 F. 2d, at 1122 (Wilkey, J., dissenting); United States v. Wilke, 450 F. 2d 877 (CA9 1971), cert. denied, 409 U. S. 918 (1972). See also 2 J. Bishop, Criminal Law § 1103, p. 819 (9th ed. 1923); 1 W. Burdick, Law of Crime 462–463 (1946); R. Perkins, Criminal Law 429 (1957); 3 F. Wharton, Criminal Law § 2003, p. 2178 (11th ed. 1912).

Respondents have not challenged the District Court's instructions on the first two elements of the crime defined by § 751 (a). It is undisputed that, on August 26, 1976, respondents were in the custody of the Attorney General as the result of either arrest on charges of felony or conviction. As for the element of "escape," we need not decide whether a person could be convicted on evidence of recklessness or negligence with respect to the limits on his freedom. A court may someday confront a case where an escapee did not know, but should have known, that he was exceeding the bounds of his confinement or that he was leaving without permission. Here, the District Court clearly instructed the juries that the prosecution bore the burden of proving that respondents "knowingly committed an act which the law makes a crime" and that they

acted "knowingly, intentionally, and deliberately. . . ." App. 221–223, 231–233. At a minimum, the juries had to find that respondents knew they were leaving the jail and that they knew they were doing so without authorization. The sufficiency of the evidence to support the juries' verdicts under this charge has never seriously been questioned, nor could it be.

The majority of the Court of Appeals, however, imposed the added burden on the prosecution to prove as a part of its case in chief that respondents acted "with an intent to avoid confinement." While, for the reasons noted above, the word "intent" is quite ambiguous, the majority left little doubt that it was requiring the Government to prove that the respondents acted with the purpose—that is, the conscious objective—of leaving the jail without authorization. In a footnote explaining their holding, for example, the majority specified that an escapee did not act with the requisite intent if he escaped in order to avoid " 'non-confinement' conditions" as opposed to "normal aspects of 'confinement.' " 190 U. S. App. D. C., at 148, n. 17, 585 F. 2d, at 1093, n. 17.

We find the majority's position quite unsupportable. Nothing in the language or legislative history of § 751 (a) indicates that Congress intended to require either such a heightened standard of culpability or such a narrow definition of confinement. As we stated earlier, the cases have generally held that, except in narrow classes of offenses, proof that the defendant acted knowingly is sufficient to support a conviction. Accordingly, we hold that the prosecution fulfills its burden under § 751 (a) if it demonstrates that an escapee knew his actions would result in his leaving physical confinement without permission. Our holding in this respect comports with parallel definitions of the crime of escape both in the Model Penal Code and in a proposed revision of the Federal Criminal Code. See Model Penal Code §§ 2.02 (3), 242.6 (1); Report of Senate Committee on the Judiciary to Accompany S. 1, S. Rep. No. 94–00, pp. 333–334 (Comm.

Print 1976).[7]  Moreover, comments accompanying the proposed revision of the Federal Criminal Code specified that the new provision covering escape "substantially carrie[d] forward existing law. . . ."  *Id.*, at 332.

## B

Respondents also contend that they are entitled to a new trial because they presented (or, in Cogdell's case, could have presented) sufficient evidence of duress or necessity to submit such a defense to the jury.  The majority below did not confront this claim squarely, holding instead that, to the extent that such a defense normally would be barred by a prisoner's failure to return to custody, neither the indictment nor the jury instructions adequately described such a requirement.  See 190 U. S. App. D. C., at 155–156, 585 F. 2d, at 1100–1101.

Common law historically distinguished between the defenses of duress and necessity.  Duress was said to excuse criminal conduct where the actor was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law.  While the defense of duress covered the situation where the coercion had its source in the

---

[7] Under the Model Penal Code, a defendant is guilty of escape if he acts even recklessly toward the material elements of the offense, since § 2.02 (3) provides that, unless otherwise provided in the definition of the offense, an element of any offense "is established if a person acts purposely, knowingly or recklessly with respect thereto."  S. 1, a proposed revision of the Federal Criminal Code, would have imposed liability on an escapee "if (1) he is reckless as to the fact that he is subject to official detention, that is, he is aware that he may be in official detention . . . but disregards the risk that he is in fact in official detention, and (2) knowingly leaves the detention area or breaks from custody."  S. Rep. No. 94-00, at 334.  As noted earlier, we do not have to decide whether or under what circumstances an escapee can be held liable under § 751 (a) if he acted only recklessly with respect to the material elements of the offense.  See *supra*, at 407.

actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils. Thus, where A destroyed a dike because B threatened to kill him if he did not, A would argue that he acted under duress, whereas if A destroyed the dike in order to protect more valuable property from flooding, A could claim a defense of necessity. See generally LaFave & Scott 374–384.

Modern cases have tended to blur the distinction between duress and necessity. In the court below, the majority discarded the labels "duress" and "necessity," choosing instead to examine the policies underlying the traditional defenses. See 190 U. S. App. D. C., at 152, 585 F. 2d, at 1097. In particular, the majority felt that the defenses were designed to spare a person from punishment if he acted "under threats or conditions that a person of ordinary firmness would have been unable to resist," or if he reasonably believed that criminal action "was necessary to avoid a harm more serious than that sought to be prevented by the statute defining the offense." *Id.*, at 152–153, 585 F. 2d, at 1097–1098. The Model Penal Code redefines the defenses along similar lines. See Model Penal Code § 2.09 (duress) and § 3.02 (choice of evils).

We need not speculate now, however, on the precise contours of whatever defenses of duress or necessity are available against charges brought under § 751 (a). Under any definition of these defenses one principle remains constant: if there was a reasonable, legal alternative to violating the law, "a chance both to refuse to do the criminal act and also to avoid the threatened harm," the defenses will fail. LaFave & Scott 379.[8] Clearly, in the context of prison escape, the escapee is

---

[8] See also *R. I. Recreation Center, Inc.* v. *Aetna Casualty & Surety Co.*, 177 F. 2d 603, 605 (CA1 1949) (a person acting under a threat of death to his relatives was denied defense of duress where he committed the crime

not entitled to claim a defense of duress or necessity unless and until he demonstrates that, given the imminence of the threat, violation of § 751 (a) was his only reasonable alternative. See *United States* v. *Boomer,* 571 F. 2d 543, 545 (CA10), cert. denied *sub nom. Heft* v. *United States,* 436 U. S. 911 (1978); *People* v. *Richards,* 269 Cal. App. 2d 768, 75 Cal. Rptr. 597 (1969).

In the present case, the Government contends that respondents' showing was insufficient on two grounds. First, the Government asserts that the threats and conditions cited by respondents as justifying their escape were not sufficiently immediate or serious to justify their departure from lawful custody. Second, the Government contends that, once the respondents had escaped, the coercive conditions in the jail were no longer a threat and respondents were under a duty to terminate their status as fugitives by turning themselves over to the authorities.

Respondents, on the other hand, argue that the evidence of coercion and conditions in the jail was at least sufficient to go to the jury as an affirmative defense to the crime charged. As for their failure to return to custody after gaining their freedom, respondents assert that this failure should be but one factor in the overall determination whether their initial departure was justified. According to respondents, their failure to surrender "may reflect adversely on the bona fides of [their] motivation" in leaving the jail, but should not with-

---

even though he had an opportunity to contact the police); *People* v. *Richards,* 269 Cal. App. 2d·768, 75 Cal. Rptr. 597 (1969) (prisoner must resort to administrative or judicial channels to remedy coercive prison conditions); Model Penal Code § 2.09 (1) (actor must succumb to a force or threat that "a person of reasonable firmness in his situation would have been unable to resist"); *id.,* § 3.02 (1) (actor must believe that commission of crime is "necessary" to avoid a greater harm); Working Papers 277 (duress excuses criminal conduct, "if at all, because given the circumstances other reasonable men must concede that they too would not have been able to act otherwise").

draw the question of their motivation from the jury's consideration. Brief for Respondents 67. See also n. 3, *supra.*

We need not decide whether such evidence as that submitted by respondents was sufficient to raise a jury question as to their initial departures. This is because we decline to hold that respondents' failure to return is "just one factor" for the jury to weigh in deciding whether the initial escape could be affirmatively justified. On the contrary, several considerations lead us to conclude that, in order to be entitled to an instruction on duress or necessity as a defense to the crime charged, an escapee must first offer evidence justifying his continued absence from custody as well as his initial departure [9] and that an indispensable element of such an offer

---

[9] We appreciate the fact that neither the prosecution nor the defense in a criminal case may put in all its evidence simultaneously, and to the extent that applicable rules of case law do not otherwise preclude such an approach, a district court is bound to find itself in situations where it admits evidence provisionally, subject to that evidence being later "tied in" or followed up by other evidence that makes the evidence conditionally admitted unconditionally admissible. In a civil action, the question whether a particular affirmative defense is sufficiently supported by testimony to go to the jury may often be resolved on a motion for summary judgment, but of course motions for summary judgment are creatures of civil, not criminal, trials. Thus, when we say that in order to have the theory of duress or necessity as a defense submitted to the jury an escapee must "first" offer evidence justifying his continuing absence from custody, we do not mean to impose a rigid mechanical formula on attorneys and district courts as to the order in which evidence supporting particular elements of a defense must be offered. The convenience of the jurors, the court, and the witnesses may all be best served by receiving the testimony "out of order" in certain circumstances, subject to an avowal by counsel that such testimony will later be "tied in" by testimony supporting the other necessary elements of a particular affirmative defense. Our holding here is a substantive one: an essential element of the defense of duress or necessity is evidence sufficient to support a finding of a bona fide effort to surrender or return to custody as soon as the claimed duress or necessity has lost its coercive force. As a general practice, trial courts will find it saves considerable time to require testimony on this element of the affirmative defense of duress or necessity first, simply because such

is testimony of a bona fide effort to surrender or return to custody as soon as the claimed duress or necessity had lost its coercive force.

First, we think it clear beyond peradventure that escape from federal custody as defined in § 751 (a) is a continuing offense and that an escapee can be held liable for failure to return to custody as well as for his initial departure. Given the continuing threat to society posed by an escaped prisoner, "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Toussie* v. *United States*, 397 U. S. 112, 115 (1970). Moreover, every federal court that has considered this issue has held, either explicitly or implicitly, that § 751 (a) defines a continuing offense. See, *e. g., United States* v. *Michelson,* 559 F. 2d 567 (CA9 1977); *United States* v. *Cluck,* 542 F. 2d 728 (CA8), cert. denied, 429 U. S. 986 (1976); *United States* v. *Joiner,* 496 F. 2d 1314 (CA5), cert. denied, 419 U. S. 1002 (1974); *United States* v. *Chapman,* 455 F. 2d 746 (CA5 1972).

Respondents point out that *Toussie* calls for restraint in labeling crimes as continuing offenses. The justification for that restraint, however, is the tension between the doctrine of continuing offenses and the policy of repose embodied in stat-

---

testimony can be heard in a fairly short time, whereas testimony going to the other necessary elements of duress or necessity may take considerably longer to present. Here, for example, the jury heard five *days* of testimony as to prison conditions, when in fact the trial court concluded, correctly, that testimony as to another essential element of this defense did not even reach a minimum threshold such that if the jury believed it that element of defense could be said to have been made out. But trial judges presiding over indictments based on § 751 (a) are in a far better position than are we to know whether, as a matter of the order of presenting witnesses and evidence, testimony from a particular witness may be allowed "out of order" subject to avowal, proffer, and the various other devices employed to avoid wasting the time of the court and jury with testimony that is irrelevant while at the same time avoiding if possible the necessity for recalling or seriously inconveniencing a witness.

utes of limitations. See 397 U. S., at 114–115. This tension is wholly absent where, as in the case of § 751 (a), the statute of limitations is tolled for the period that the escapee remains at large.[10]

The remaining considerations leading to our conclusion are, perhaps ironically, derived from the same concern for the statutory and constitutional right of jury trial upon which the majority of the Court of Appeals based its reasoning. There was no significant "variance" in the indictment merely because respondents had not been indicted under a theory of escape as a continuing offense and because the District Court did not explain this theory to the juries. We have held on several occasions that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling* v. *United States*, 418 U. S. 87, 117 (1974). These indictments, which track closely the language of § 751 (a), were undoubtedly sufficient under this standard. See 418 U. S., at 117. As for the alleged failure of the District Court to elaborate for the benefit of the jury on the continuing nature of the charged offense, we believe that such elaboration was unnecessary where, as here, the evidence failed as a matter of law in a crucial particular to reach the minimum threshold that would have required an instruction on respondents' theory of the case generally.

The Anglo-Saxon tradition of criminal justice, embodied in the United States Constitution and in federal statutes, makes jurors the judges of the credibility of testimony offered by witnesses. It is for them, generally, and not for appellate

---

[10] Title 18 U. S. C. § 3290 provides that "[n]o statute of limitations shall extend to any person fleeing from justice." Because an escaped prisoner is, by definition, a fugitive from justice, the statute of limitations normally applicable to federal offenses would be tolled while he remained at large. See, *e. g., Howgate* v. *United States*, 7 App. D. C. 217 (1895).

courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story. An escapee who flees from a jail that is in the process of burning to the ground may well be entitled to an instruction on duress or necessity, " 'for he is not to be hanged because he would not stay to be burnt.' " *United States* v. *Kirby,* 7 Wall. 482, 487 (1869). And in the federal system it is the jury that is the judge of whether the prisoner's account of his reason for flight is true or false. But precisely because a defendant is entitled to have the credibility of his testimony, or that of witnesses called on his behalf, judged by the jury, it is essential that the testimony given or proffered meet a minimum standard as to each element of the defense so that, if a jury finds it to be true, it would support an affirmative defense—here that of duress or necessity.

We therefore hold that, where a criminal defendant is charged with escape and claims that he is entitled to an instruction on the theory of duress or necessity, he must proffer evidence of a bona fide effort to surrender or return to custody as soon as the claimed duress or necessity had lost its coercive force. We have reviewed the evidence examined elaborately in the majority and dissenting opinions below, and find the case not even close, even under respondents' versions of the facts, as to whether they either surrendered or offered to surrender at their earliest possible opportunity. Since we have determined that this is an indispensable element of the defense of duress or necessity, respondents were not entitled to any instruction on such a theory. Vague and necessarily self-serving statements of defendants or witnesses as to future good intentions or ambiguous conduct simply do not support a finding of this element of the defense.[11]

---

[11] Contrary to the implication of MR. JUSTICE BLACKMUN's dissent describing the rationale of the necessity defense as "a balancing of harms," *post,* at 427, we are construing an Act of Congress, not drafting it. The statute itself, as we have noted, requires no heightened *mens rea* that might be negated by any defense of duress or coercion. We nonetheless recognize that Congress in enacting criminal statutes legislates against a

## III

In reversing the judgments of the Court of Appeals, we believe that we are at least as faithful as the majority of that court to its expressed policy of "allowing the jury to perform its accustomed role" as the arbiter of factual disputes. 190 U. S. App. D. C., at 151, 585 F. 2d, at 1096. The requirement of a threshold showing on the part of those who assert an affirmative defense to a crime is by no means a derogation of the importance of the jury as a judge of credibility. Nor is it based on any distrust of the jury's ability to separate fact from fiction. On the contrary, it is a testament to the importance of trial by jury and the need to husband the resources necessary for that process by limiting evidence in a trial to that directed at the elements of the crime or at affirmative defenses. If, as we here hold, an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court and jury need not be burdened with testimony supporting other elements of the defense.

---

background of Anglo-Saxon common law, see *Morissette* v. *United States,* 342 U. S. 246 (1952), and that therefore a defense of duress or coercion may well have been contemplated by Congress when it enacted § 751 (a). But since the express purpose of Congress in enacting that section was to punish escape from penal custody, we think that some duty to return, a duty described more elaborately in the text, must be an essential element of the defense unless the congressional judgment that escape from prison is a crime be rendered wholly nugatory. Our principal difference with the dissent, therefore, is not as to the existence of such a defense but as to the importance of surrender as an element of it. And we remain satisfied that, even if credited by the jury, the testimony set forth at length in MR. JUSTICE BLACKMUN's dissenting opinion could not support a finding that respondents had no alternatives but to remain at large until recaptured anywhere from one to three and one-half months after their escape. To hold otherwise would indeed quickly reduce the overcrowding in prisons that has been universally condemned by penologists. But that result would be accomplished in a manner quite at odds with the purpose of Congress when it made escape from prison a federal criminal offense.

These cases present a good example of the potential for wasting valuable trial resources. In general, trials for violations of § 751 (a) should be simple affairs. The key elements are capable of objective demonstration; the *mens rea,* as discussed above, will usually depend upon reasonable inferences from those objective facts. Here, however, the jury in the trial of Bailey, Cooley, and Walker heard five days of testimony. It was presented with evidence of every unpleasant aspect of prison life from the amount of garbage on the cellblock floor, to the meal schedule, to the number of times the inmates were allowed to shower. Unfortunately, all this evidence was presented in a case where the defense's reach hopelessly exceeded its grasp. Were we to hold, as respondents suggest, that the jury should be subjected to this potpourri even though a critical element of the proffered defenses was concededly absent, we undoubtedly would convert every trial under § 751 (a) into a hearing on the current state of the federal penal system.

Because the juries below were properly instructed on the *mens rea* required by § 751 (a), and because the respondents failed to introduce evidence sufficient to submit their defenses of duress and necessity to the juries, we reverse the judgments of the Court of Appeals.

*Reversed.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of these cases.

MR. JUSTICE STEVENS, concurring.

The essential difference between the majority and the dissent is over the question whether the record contains enough evidence of a bona fide effort to surrender or return to custody to present a question of fact for the jury to resolve. On this issue, I agree with the Court that the evidence introduced by defendants Cooley, Bailey, and Cogdell was plainly insuffi-

cient. Vague references to anonymous intermediaries are so inherently incredible that a trial judge is entitled to ignore them. With respect to Walker, however, the question is much closer because he testified that he personally telephoned an FBI agent three times in an effort to negotiate a surrender.[1] But since he remained at large for about two months after his last effort to speak with the FBI, I am persuaded that even under his version of the facts he did not make an adequate attempt to satisfy the return requirement.

The fact that I have joined the Court's opinion does not indicate that I—or indeed that any other Member of the majority—is unconcerned about prison conditions described by MR. JUSTICE BLACKMUN. Because we are construing the federal escape statute, however, I think it only fair to note that such conditions are more apt to prevail in state or county facilities than in federal facilities.[2] Moreover, reasonable men may well differ about the most effective methods of redressing the situation. In my view, progress toward acceptable solutions involves formulating enforceable objective standards for civilized prison conditions,[3] keeping the channels of communication between prisoners and the outside world open,[4] and guaranteeing access to the courts,[5] rather than relying on ad hoc judgments about the good faith of

---

[1] The rebuttal testimony described by the Court, *ante*, at 399, n. 2, indicates that Walker was probably not telling the truth; but in deciding whether Walker's testimony was sufficient, I assume its veracity.

[2] Compare, for example, *Hutto* v. *Finney*, 437 U. S. 678, with *Bell* v. *Wolfish*, 441 U. S. 520.

[3] See *Estelle* v. *Gamble*, 429 U. S. 97, 116–117 (STEVENS, J., dissenting).

[4] See *Houchins* v. *KQED, Inc.*, 438 U. S. 1, 19 (STEVENS, J., dissenting); *Jones* v. *North Carolina Prisoners' Union*, 433 U. S. 119, 138 (STEVENS, J., dissenting in part); *Morales* v. *Schmidt*, 489 F. 2d 1335, 1344 (CA7 1973) (Stevens, J., dissenting), modified, 494 F. 2d 85, 87 (CA7 1974) (en banc) (Stevens, J., concurring).

[5] See, *e. g.*, *Harris* v. *Pate*, 440 F. 2d 315 (CA7 1971). Cf. *Meachum* v. *Fano*, 427 U. S. 215, 229 (STEVENS, J., dissenting).

prison administrators,[6] giving undue deference to their "expertise"[7] or encouraging self-help by convicted felons.[8] In short, neither my agreement with much of what MR. JUSTICE BLACKMUN has written, nor my disagreement with the Court about related issues, prevents me from joining its construction of the federal escape statute.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE BRENNAN joins, dissenting.

The Court's opinion, it seems to me, is an impeccable exercise in undisputed general principles and technical legalism: The respondents were properly confined in the District of Columbia jail. They departed from that jail without authority or consent. They failed promptly to turn themselves in when, as the Court would assert by way of justification, *ante*, at 413, 415, the claimed duress or necessity "had lost its coercive force." Therefore, the Court concludes, there is no defense for a jury to weigh and consider against the respondents' prosecution for escape violative of 18 U. S. C. § 751 (a).

It is with the Court's assertion that the claimed duress or necessity had lost its coercive force that I particularly disagree. The conditions that led to respondents' initial departure from the D. C. jail continue unabated. If departure was justified—and on the record before us that issue, I feel, is for the jury to resolve as a matter of fact in the light of

---

[6] See, *e. g., Procunier* v. *Navarette,* 434 U. S. 555, 568 (STEVENS, J., dissenting).

[7] See *Bell* v. *Wolfish, supra,* at 584–585 (STEVENS, J., dissenting).

[8] It would be unwise, and perhaps counterproductive, to immunize escapes that would otherwise be unlawful in the hope that they would motivate significant reforms. "An unselfish motive affords no assurance that a crime will produce the results its perpetrator intends." *United States* v. *Cullen,* 454 F. 2d 386, 392, n. 17 (CA7 1971). Minimizing the risk of escape is, of course, the classic justification for imposing rigid discipline within prison walls.

the evidence, and not for this Court to determine as a matter of law—it seems too much to demand that respondents, in order to preserve their legal defenses, return forthwith to the hell that obviously exceeds the normal deprivations of prison life and that compelled their leaving in the first instance. The Court, however, requires that an escapee's action must amount to nothing more than a mere and temporary gesture that, it is to be hoped, just might attract attention in responsive circles. But life and health, even of convicts and accuseds, deserve better than that and are entitled to more than pious pronouncements fit for an ideal world.

The Court, in its carefully structured opinion, does reach a result that might be a proper one were we living in that ideal world, and were our American jails and penitentiaries truly places for humane and rehabilitative treatment of their inmates. Then the statutory crime of escape could not be excused by duress or necessity, by beatings, and by guard-set fires in the jails, for these would not take place, and escapees would be appropriately prosecuted and punished.

But we do not live in an ideal world "even" (to use a self-centered phrase) in America, so far as jail and prison conditions are concerned. The complaints that this Court, and every other American appellate court, receives almost daily from prisoners about conditions of incarceration, about filth, about homosexual rape, and about brutality are not always the mouthings of the purely malcontent. The Court itself acknowledges, *ante,* at 398, that the conditions these respondents complained about do exist. It is in the light of this stark truth, it seems to me, that these cases are to be evaluated. It must follow, then, that the jail-condition evidence proffered by respondent Cogdell should have been admitted, and that the jury before whom respondents Bailey, Cooley, and Walker were tried should not have been instructed to disregard the jail-condition evidence that did come in. I therefore dissent.

I

The atrocities and inhuman conditions of prison life in America are almost unbelievable; surely they are nothing less than shocking. The dissent in the *Bailey* case in the Court of Appeals acknowledged that "the circumstances of prison life are such that at least a colorable, if not credible, claim of duress or necessity can be raised with respect to virtually every escape." 190 U. S. App. D. C. 142, 167, 585 F. 2d 1087, 1112. And the Government concedes: "In light of prison conditions that even now prevail in the United States, it would be the rare inmate who could not convince himself that continued incarceration would be harmful to his health or safety." Brief for United States 27. See *Furtado* v. *Bishop*, 604 F. 2d 80 (CA1 1979), cert. denied, *post*, p. 1035. Cf. *Bell* v. *Wolfish*, 441 U. S. 520 (1979).

A youthful inmate can expect to be subjected to homosexual gang rape his first night in jail, or, it has been said, even in the van on the way to jail.[1] Weaker inmates become the property of stronger prisoners or gangs, who sell the sexual services of the victim. Prison officials either are disinterested in stopping abuse of prisoners by other prisoners or are incapable of doing so, given the limited resources society allocates to the prison system.[2] Prison officials often are merely indifferent to serious health and safety needs of prisoners as well.[3]

---

[1] See, *e. g.*, C. Silberman, Criminal Violence, Criminal Justice 389 (1978); Report on Sexual Assaults in a Prison System and Sheriff's Vans, in 3 L. Radzinowicz & M. Wolfgang, eds., Crime and Justice 223–228 (2d ed. 1977).

[2] See generally Silberman, *supra*, at 379–382, 386–392; C. Bartollas, S. Miller, & S. Dinitz, Juvenile Victimization—The Institutional Paradox (1976); C. Weiss & D. Friar, Terror in the Prisons (1974); O. Ballesteros, Behind Jail Bars 26–27 (1979); M. Luttrell, Behind Prison Walls 64–65 (1974).

[3] *E. g.*, Weiss & Friar, *supra*, at 183–184 (youth having epileptic seizure sprayed with tear gas, resulting in severe trauma); G. Mueller, Medical Services in Prison: Lessons from Two Surveys, in CIBA Founda-

Even more appalling is the fact that guards frequently participate in the brutalization of inmates.[4] The classic example is the beating or other punishment in retaliation for prisoner complaints or court actions.[5]

The evidence submitted by respondents in these cases fits that pattern exactly. Respondent Bailey presented evidence that he was continually mistreated by correctional officers during his stay at the D. C. jail. He was threatened that his testimony in the Brad King case would bring on severe retribution. App. 142, 145. Other inmates were beaten by guards as a message to Bailey. *Id.*, at 36. An inmate testified that on one occasion, three guards displaying a small knife told him that they were going "to get your buddy, that nigger Bailey. We're going to kill him." *Id.*, at 94. The threats culminated in a series of violent attacks on Bailey. Blackjacks, mace, and slapjacks (leather with a steel insert) were used in beating Bailey. *Id.*, at 94, 101, 146–150.

Respondent Cooley also elicited testimony from other inmates concerning beatings of Cooley by guards with slapjacks, blackjacks, and flashlights. *Id.*, at 46–47, 97–98, 106, 116–118,

---

tion Symposium 16, Medical Care of Prisoners and Detainees 7, 11–16 (1973); J. Mitford, Kind & Usual Punishment 135 (1973); Univ. of Pa. Law School, Health Care and Conditions in Pennsylvania's State Prisons (1972), reprinted in ABA Comm'n on Correctional Facilities and Services, Standards and Materials on Medical and Health Care in Jails, Prisons, and Other Correctional Facilities 71 (1974); Report of the Medical Advisory Committee on State Prisons to Comm'r of Correction and Sec'y of Human Services, Commonwealth of Mass. (1971), reprinted in ABA Standards and Materials 89.

[4] See, *e. g.*, Weiss & Friar, *supra*, at 54–60, 163–164, 176–181, 188, 199–200, 222.

[5] See, *e. g.*, Note, Escape From Cruel and Unusual Punishment: A Theory of Constitutional Necessity, 59 B. U. L. Rev. 334, 358–360 (1979); *Landman* v. *Royster*, 333 F. Supp. 621, 633–634 (ED Va. 1971); *Sostre* v. *Rockefeller*, 312 F. Supp. 863, 869 (SDNY 1970), rev'd in part, modified in part, aff'd in part *sub nom. Sostre* v. *McGinnis*, 442 F. 2d 178 (CA2 1971) (en banc), cert. denied *sub nom. Sostre* v. *Oswald*, 404 U. S. 1049 (1972); Mitford, *supra*, at 260–262.

166–167, 185–186.  There was evidence that guards threatened to kill Cooley.  *Id.,* at 107.

It is society's responsibility to protect the life and health of its prisoners.  "[W]hen a sheriff or a marshall [*sic*] takes a man from the courthouse in a prison van and transports him to confinement for two or three or ten years, *this is our act.  We* have tolled the bell for him.  And whether we like it or not, we have made him our collective responsibility.  We are free to do something about him; he is not" (emphasis in original).  Address by THE CHIEF JUSTICE, 25 Record of the Assn. of the Bar of the City of New York 14, 17 (Mar. 1970 Supp.).  Deliberate indifference to serious and essential medical needs of prisoners constitutes "cruel and unusual" punishment violative of the Eighth Amendment.  *Estelle* v. *Gamble,* 429 U. S. 97, 104 (1976).

> "An inmate must rely on prison authorities to treat his medical needs. . . .  In the worst cases, such a failure may actually produce physical 'torture or a lingering death'. . . .  In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. . . .  The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency."  *Id.,* at 103.

It cannot be doubted that excessive or unprovoked violence and brutality inflicted by prison guards upon inmates violates the Eighth Amendment.  See, *e. g., Jackson* v. *Bishop,* 404 F. 2d 571 (CA8 1968).  The reasons that support the Court's holding in *Estelle* v. *Gamble* lead me to conclude that failure to use reasonable measures to protect an inmate from violence inflicted by other inmates also constitutes cruel and unusual punishment.  Homosexual rape or other violence serves no penological purpose.  Such brutality is the equivalent of torture, and is offensive to any modern standard of human dignity.  Prisoners must depend, and rightly so, upon the prison administrators for protection from abuse of this kind.

There can be little question that our prisons are badly over-crowded and understaffed and that this in large part is the cause of many of the shortcomings of our penal systems. This, however, does not excuse the failure to provide a place of confinement that meets minimal standards of safety and decency.

Penal systems in other parts of the world demonstrate that vast improvement surely is not beyond our reach. "The contrast between our indifference and the programs in some countries of Europe—Holland and the Scandinavian countries in particular—is not a happy one for us." Address by THE CHIEF JUSTICE, *supra*, at 20. "It has been many years since Swedish prisoners were concerned with such problems as 'adequate food, water, shelter'; 'true religious freedom'; and 'adequate medical treatment.'" Ward, Inmate Rights and Prison Reform in Sweden and Denmark, 63 J. Crim. L., C. & P. S. 240 (1972). See also Profile/Sweden, Corrections Magazine 11 (June 1977). Sweden's prisons are not over-crowded, and most inmates have a private cell. Salomon, Lessons from the Swedish Criminal Justice System: A Reappraisal, 40 Fed. Probation 40, 43 (Sept. 1976). The prisons are small. The largest accommodate 300–500 inmates; most house 50–150. *Id.*, at 43; Profile/Sweden, *supra*, at 14. "There appears to be a relaxed atmosphere between staff and inmates, and a prevailing attitude that prisoners must be treated with dignity and respect." Siegel, Criminal Justice—Swedish Style: A Humane Search for Answers, 1 Offender Rehabilitation 291, 292 (1977).

## II

The real question presented in this case is whether the prisoner should be punished for helping to extricate himself from a situation where society has abdicated completely its basic responsibility for providing an environment free of life-threatening conditions such as beatings, fires, lack of essential medical care, and sexual attacks. To be sure, Congress in so

many words has not enacted specific statutory duress or necessity defenses that would excuse or justify commission of an otherwise unlawful act. The concept of such a defense, however, is "anciently woven into the fabric of our culture." J. Hall, General Principles of Criminal Law 416 (2d ed. 1960), quoted in Brief for United States 21. And the Government concedes that "it has always been an accepted part of our criminal justice system that punishment is inappropriate for crimes committed under duress because the defendant in such circumstances cannot fairly be blamed for his wrongful act." *Id.*, at 23.

Although the Court declines to address the issue, it at least implies that it would recognize the common-law defenses of duress and necessity to the federal crime of prison escape, if the appropriate prerequisites for assertion of either defense were met. See *ante,* at 410–413. Given the universal acceptance of these defenses in the common law, I have no difficulty in concluding that Congress intended the defenses of duress and necessity to be available to persons accused of committing the federal crime of escape.

I agree with most of the Court's comments about the essential elements of the defenses. I, too, conclude that intolerable prison conditions are to be taken into account through affirmative defenses of duress and necessity, rather than by way of the theory of intent espoused by the Court of Appeals. That court's conclusion that intent to avoid the *normal* aspects of confinement is an essential element of the offense of escape means that the burden of proof is on the Government to prove that element. According to our precedents, *e. g., Mullaney* v. *Wilbur,* 421 U. S. 684 (1975), the Government would have to prove that intent beyond a reasonable doubt. It is unlikely that Congress intended to place this difficult burden on the prosecution. The legislative history is sparse, and does not specifically define the requisite intent. Circumstances that compel or coerce a person to

commit an offense, however, traditionally have been treated as an affirmative defense, with the burden of proof on the defendant. Although intolerable prison conditions do not fit within the standard definition of a duress or necessity defense, see 190 U. S. App. D. C., at 151–152, n. 29, 585 F. 2d, at 1096–1097, n. 29, they are analogous to these traditional defenses. I therefore agree that it is appropriate to treat unduly harsh prison conditions as an affirmative defense.

I also agree with the Court that the absence of reasonable less drastic alternatives is a prerequisite to successful assertion of a defense of necessity or duress to a charge of prison escape. One must appreciate, however, that other realistic avenues of redress seldom are open to the prisoner. Where prison officials participate in the maltreatment of an inmate, or purposefully ignore dangerous conditions or brutalities inflicted by other prisoners or guards, the inmate can do little to protect himself. Filing a complaint may well result in retribution, and appealing to the guards is a capital offense under the prisoners' code of behavior.[6] In most instances, the question whether alternative remedies were thoroughly "exhausted" should be a matter for the jury to decide.

I, too, conclude that the jury generally should be instructed that, in order to prevail on a necessity or duress defense, the defendant must justify his continued absence from custody, as well as his initial departure. I agree with the

---

[6] See, e. g., R. Goldfarb, Jails: The Ultimate Ghetto 325–326 (1975) (Official of Oklahoma Crime Commission describes gang rape and concludes: "[if the kid tells the guards] . . . his life isn't worth a nickel"); State v. Green, 470 S. W. 2d 565, 569 (Mo. 1971) (dissenting opinion), cert. denied, 405 U. S. 1073 (1972).

The alleged facts in this case appear to be typical. Respondent Bailey filed suit in the Superior Court of the District of Columbia to "stop the administrators from threatening my life." App. 176. Bailey testified that the suit caused the guards to threaten him in an attempt to persuade him to withdraw the action, to beat him, and to transfer him to the mental ward. Id., at 154–155. Bailey's suit subsequently was dismissed with prejudice. Brief for Respondents 15–16, n. 7.

Court that the very nature of escape makes it a continuing crime. But I cannot agree that the only way continued absence can be justified is by evidence "of a bona fide effort to surrender or return to custody." *Ante,* at 413, 415. The Court apparently entertains the view, naive in my estimation, that once the prisoner has escaped from a life- or health-threatening situation, he can turn himself in, secure in the faith that his escape somehow will result in improvement in those intolerable prison conditions. While it may be true in some rare circumstance that an escapee will obtain the aid of a court or of the prison administration once the escape is accomplished, the escapee, realistically, faces a high probability of being returned to the same prison and to exactly the same, or even greater, threats to life and safety.

The rationale of the necessity defense is a balancing of harms. If the harm caused by an escape is less than the harm caused by remaining in a threatening situation, the prisoner's initial departure is justified. The same rationale should apply to hesitancy and failure to return. A situation may well arise where the social balance weighs in favor of the prisoner even though he fails to return to custody. The escapee at least should be permitted to present to the jury the possibility that the harm that would result from a return to custody outweighs the harm to society from continued absence.

Even under the Court's own standard, the defendant in an escape prosecution should be permitted to submit evidence to the jury to demonstrate that surrender would result in his being placed again in a life- or health-threatening situation. The Court requires return to custody once the "claimed duress or necessity had lost its coercive force." *Ante,* at 413, 415. Realistically, however, the escapee who reasonably believes that surrender will result in return to what concededly is an intolerable prison situation remains subject to the same "coercive force" that prompted his escape in the first instance. It is ironic to say that that force is automatically "lost" once the prison wall is passed.

The Court's own phrasing of its test demonstrates that it is deciding factual questions that should be presented to the jury. It states that a "bona fide" effort to surrender must be proved. *Ibid.* Whether an effort is "bona fide" is a jury question. The Court also states that "[v]ague and necessarily self-serving statements of defendants or witnesses as to future good intentions or ambiguous conduct simply do not support a finding of this element of the defense." *Ante,* at 415. Traditionally, it is the function of the jury to evaluate the credibility and meaning of "necessarily self-serving statements" and "ambiguous conduct." See *People* v. *Luther,* 394 Mich. 619, 232 N. W. 2d 184 (1975); *People* v. *Unger,* 66 Ill. 2d 333, 362 N. E. 2d 319 (1977); *Esquibel* v. *State,* 91 N. M. 498, 576 P. 2d 1129 (1978).

Finally, I of course must agree with the Court that use of the jury is to be reserved for the case in which there is sufficient evidence to support a verdict. I have no difficulty, however, in concluding that respondents here did indeed submit sufficient evidence to support a verdict of not guilty, if the jury were so inclined, based on the necessity defense. Respondent Bailey testified that he was in fear for his life, that he was afraid he would still face the same threats if he turned himself in, and that "[t]he FBI was telling my people that they was going to shoot me." App. 176.[7] Respondent

---

[7] "Q Why didn't you surrender yourself?

"A I was in fear of my life. I know that if I turned myself in I would still be under the threats of death. Always knew that the FBI wanted to kill me, after I escaped, so I was in limbo. I didn't know what to do. I did have some people call to the officials at the jail on several occasions.

"Q Let me ask you a question: You stated that you never surrendered yourself, because you were still fearful of the threats?

"A That is right.

"Q Did you understand where you would be returned to?

"A Yes, sir.

"Q Where?

Cooley testified that he did not know anyone to call, and that he feared that the police would shoot him when they came to get him. *Id.,* at 119.[8] Respondent Walker testified that he had been in "constant rapport," *id.,* at 195, with an FBI agent, who assured him that the FBI would not harm him, but who would not promise that he would not be returned to the D. C. jail. *Id.,* at 200. Walker also stated

---

"A The new detention center, 1901 D Street, Southeast.

"Q What section?

"A Northeast 1.

"Q Did you know who the guards would be?

"A The same officers that was there before I left.

"Q Did you ever hear that the FBI was looking for you?

"A Yes, I did.

"Q Didn't you feel that you could tell the FBI that you didn't want to return to the D. C. Jail in Northeast 1?

"A No. The FBI was telling my people that they was going to shoot me." App. 175–176.

[8] "Q Once you left the jail, Mr. Cooley, did you make any attempt to notify anybody in authority to say you were out and did you make any attempt to notify anybody that you were out?

"A Yeah.

"Q To whom?

"A Like I ain't do it per se. But, like when I went home, you know, my people called and I told them that I had, I told them what happened. Why I had done it. They was mad. I told them why I had done it. They understood, but they called and never got in touch with anybody.

"Q Did you ever make any attempt to call anybody, yourself?

"A I don't know nobody to call. I'm thinking like this here: They don't like me in the jail. Ain't nobody I can call.

"Q Why did you not call anybody at the jail?

"A For what?

"Q Did you feel that there would be any purpose in doing that?

"A It wouldn't have been none. They probably came and got me, and then make me try to run and they shoot me in half when they come and get me.

"Q So you feared for your life. You could not call for that reason?

"A That is right.

"Q Did you ever leave Washington, D. C., after you left the jail?

"A No." *Id.,* at 119.

that he had heard through his sister that the FBI "said that if they ran down on me they was going to kill me." *Id.*, at 195.[9]

---

[9] The defendant Walker:

"Now, there is one more issue that I want to briefly touch on here and that is the fact that after I was released from the detention facility I did in fact contact the proper authorities. I contacted the FBI on a number of occasions. As a matter of fact I kept a constant rapport with the FBI. I had people who had told me that they had brought this information to my sisters that the FBI said that if they ran down on me they was going to kill me. So, in actuality I was never out of immediate danger. I was never out of immediate threat of losing my life. If I would have given myself up I had this FBI threat to contend with and I also had to go back over to the same jail that I had just left from, and this was the reason that I consequently never turned myself into the authorities That is my testimony.

.        .        .        .        .

### "CROSS-EXAMINATION

"Q Mr. Walker, do you know the names of the individuals in the FBI that you retained this constant rapport with during the course of your escape?

"A One of them was an Officer Troy or Fauntroy, or something of that nature. I don't know if that is his exact name or not.

"Q When did you call him, sir?

"A I called him the second day after I was out, and after that I had occasion to call him on several different occasions.

"Q Did you identify yourself at those times?

"A Yes, I identified myself.

"Q Did you indicate where you were?

"A No, I didn't indicate where I was.

"Q Did you tell him that you were going to surrender yourself?

"A I told him that I would surrender myself if I wasn't being subjected to the same conditions and put on the same penitentiary that I had just left from.

"Q How many days did you call this gentleman?

"A I don't know. I called him two or three different times during the period that I was in the streets.

"Q You were out until December 13th, is that correct?

"A I think that is the date.

.        .        .        .        .

Perhaps it is highly unlikely that the jury would have believed respondents' stories that the FBI planned to shoot them on sight, or that respondent Walker had been in con-

"Q Now, sir, where did you make the phone call from to the FBI?

"A I made the first one from a public phone booth.

"Q How did you know what number to call, sir? Did you look it up in the directory?

"A I looked it up in the directory.

"Q Did you ask for anybody in particular at the FBI?

"A No, I just asked to speak to someone on the warrant squad or someone who was connected with escapees.

"Q Would the name Fluharty, does that ring a bell? Would that name Fluharty ring a bell with you as the name of a gentleman you may have spoken to, if you spoke to someone?

"A Sounds halfway familiar.

"Q Exactly what did you tell him, sir?

"A I explained to him that I was one of the four gentlemen that had escaped from the detention facility on August 26th, because of the conditions that existed there.

"I explained to him how terminal the conditions were there and asked him was it any kind of way that I could get with him to make some type of arrangements as far as turning myself in, if I wouldn't have to go back to the detention facility at 1901 D Street, Southeast and also asked him had there been anything issued concerning, or had he told a man named Earl Berman, whether or not the FBI—or, did he have knowledge that anybody at the FBI had told Mr. Earl Berman that he had intended to kill me if I was arrested.

"Q Who is Earl Berman, sir?

"A Earl Berman is a personal friend of mine.

"Q Are you saying that Mr. Berman told you that the FBI was going to kill you?

"A Yes, he did. He didn't tell me, but he told my sister and my sister related this information to me.

"Q So, you heard it third-hand?

"A Yes, I heard it second-hand.

. . . . .

"BY MR. SCHAARS:

. . . . .

"Q Now, sir, when exactly was the first time that you called Agent Fluharty or someone by the name of Fauntroy with the FBI?

stant communication with an FBI agent. Nevertheless, such testimony, even though "self-serving," and possibly extreme and unwarranted in part, was sufficient to permit the jury to decide whether the failure to surrender immediately was jus-

"A The second day I was out.

"Q Would that be on the 28th, sir?

"A That would be on the 28th.

"Q Do you recall about what time of day it was, sir?

"A I don't know. It was in the early morning hours. I would say have to be between 4:00 and 6:00.

"Q A. M., sir?

"A A. M.

"Q And, do you know [how] long your' conversation lasted at that point?

"A It had—no longer than a three-minute duration at the most.

"Q And you did identify yourself?

"A I did identify myself.

"Q When was the second time that you spoke to somebody from the FBI?

"A Approximately a week and a half later.

"Q Would it be fair to say that that would be about ten days later, sir?

"A I think that would be fair.

"Q To whom did you speak at that time?

"A To the same person.

"Q Did you ask for him at that time, sir or—

"A Yes, I did. I had called the FBI building previous to that, told them that I was going to call.

"Q Do you recall what time of day you called at that time, sir?

"A It was about 2:00 in the afternoon.

"Q How long did your conversation take at that time?

"A No more than a three-minute duration then.

"Q Did you identify yourself, sir?

"A Yes, I identified myself.

"Q At that time did you indicate to Agent Fluharty that you were going to turn yourself in?

"A I indicated to him if he could work out the conditions for which I wanted to turn myself in, I would turn myself in.

"Q What were the conditions?

"A Those conditions would be the fact that I wouldn't be harmed by

tified or excused. This is routine grist for the jury mill and the jury usually is able to sort out the fabricated and the incredible.

In conclusion, my major point of disagreement with the Court is whether a defendant may get his duress or necessity

---

any agent of the FBI, I wouldn't be taken back to the detention facility, 1901 D Street, Southeast.

"Q Did there come a time that you spoke to somebody from the FBI again?

"A Yes, there did.

"Q When was that, sir?

"A I would say that would have been about a month later.

"Q Would that be mid-October, sir, or late October or mid-November? I'm sorry, I don't mean to confuse you.

"A It was in—it was in October. I don't know whether it was late or—It was around—it was in October, around, between the middle and first part of October.

"Q Now, whom did you speak to at that time, sir?

"A The same guy.

"Q Agent Fluharty?

"A I assume that is his name.

"Q It was somebody on the warrant or escape squad that you were speaking to each time, sir?

"A I assume that he was.

"Q Did you ask specifically for somebody on that squad the first time you called?

"A The first time I called I did.

"Q And the second time, did you ask for the same agent by name?

"A Yes, I did.

"Q And the third time, did you ask for the same agent by name?

"A Yes.

"Q Now, sir, on that third occasion did you offer to come down and turn yourself in?

"A Under certain specified conditions.

"Q The same conditions as you have indicated on the two prior occasions?

"A The very same conditions.

"Q Now, sir, did there come a time when you called the FBI again?

"A To my recollection, no.

"Q So, from the beginning to the middle of October, whenever that

defense to the jury when it is supported only by "self-serving" testimony and "ambiguous conduct." It is difficult to imagine any case, criminal or civil, in which the jury is asked

---

third phone call occurred, to December 13th, you had no contact with the FBI?

"A To my recollection, no.

"Q Did you call any other law enforcement agency during that period of time, sir?

"A No, I didn't.

"Q Did you ever appear in any court of the District of Columbia to turn yourself in during that period of time?

"A No, I didn't.

"Q Did you ever talk to a minister or a priest or any kind of religious leader in an effort to turn yourself in during that period of time?

"A Yes, I did. I'm a minister myself.

"Q You are, sir? Did you speak to another member of your faith, a minister?

"A Yes, I did.

"Q To whom did you speak, sir?

"A I don't want to give his name at this time. I don't want to incriminate him as far as anything, as far as my escape and everything is concerned. You'd have him up here for a charge.

"Q Did you tell that gentleman that you were going to turn yourself in?

"A I told him—I had discussed turning myself in with a member of the FBI and I thought very seriously about it, if the conditions that I had specified to you could be worked out.

"Q When you spoke to this gentleman from the FBI, did he ever indicate that he would agree to those conditions?

"A No, he didn't.

"Q Did he indicate that he would agree with anything?

"A He indicated that he would agree that I wouldn't be harmed by any members of the Federal Bureau of Investigation, but that he couldn't agree that I wouldn't be taken back to the detention facility, 1901 D Street.

"Q So, he did promise you that the FBI wasn't going to hurt you?

"A Yes, he told me that the FBI wouldn't hurt me.

"Q Did you have any contact with a warrant squad officer of the District of Columbia Department of Corrections during your period of elopment [sic]?

"A Not to my recollection, unless he is part of that warrant squad."
App. 195–200.

to decide a factual question based on completely disinterested testimony and unambiguous actions. The very essence of a jury issue is a dispute over the credibility of testimony by interested witnesses and the meaning of ambiguous actions.

Ruling on a defense as a matter of law and preventing the jury from considering it should be a rare occurrence in criminal cases. "[I]n a criminal case the law assigns [the fact-finding function] solely to the jury." *Sandstrom* v. *Montana,* 442 U. S. 510, 523 (1979). The jury is the conscience of society and its role in a criminal prosecution is particularly important. *Duncan* v. *Louisiana,* 391 U. S. 145, 156 (1968). Yet the Court here appears to place an especially strict burden of proof on defendants attempting to establish an affirmative defense to the charged crime of escape. That action is unwarranted. If respondents' allegations are true, society is grossly at fault for permitting these conditions to persist at the D. C. jail. The findings of researchers and government agencies, as well as the litigated cases, indicate that in a general sense these allegations are credible.[10] The case for recognizing the duress or necessity defenses is even more compelling when it is society, rather than private actors, that creates the coercive conditions. In such a situation it is especially appropriate

---

[10] In addition to the sources cited above, see American Assembly, Prisoners in America (1973); S. Sheehan, A Prison and a Prisoner (1978); V. Williams & M. Fish, Convicts, Codes, and Contraband (1974); Inside— Prison American Style (R. Minton, ed. 1971); T. Murton, The Dilemma of Prison Reform (1976); American Friends Service Committee, Struggle for Justice, A Report on Crime and Punishment in America (1971); Behind Bars: Prisoners in America (R. Kwartler ed. 1977); B. Bagdikian & L. Dash, The Shame of the Prisons (1972); Note, 13 Ga. L. Rev. 300 (1978); Note, Intolerable Conditions as a Defense to Prison Escapes, 26 UCLA L. Rev. 1126 (1979); Comment, 127 U. Pa. L. Rev. 1142 (1979); Note, 54 Chi.-Kent L. Rev. 913 (1978); Comment, 26 Buffalo L. Rev. 413 (1977); Plotkin, Surviving Justice: Prisoners' Rights To Be Free from Physical Assault, 23 Cleve. St. L. Rev. 387 (1974); Note, 45 S. Cal. L. Rev. 1062 (1972); Note, 36 Albany L. Rev. 428 (1972).

that the jury be permitted to weigh all the factors and strike the balance between the interests of prisoners and that of society. In an attempt to conserve the jury for cases it considers truly worthy of that body, the Court has ousted the jury from a role it is particularly well suited to serve.