UNITED STATES of America, Appellee,

v.

Kourosh BAKHTIARI,
Defendant–Appellant.

Nos. 1233 to 1235, Dockets 89–1644,
89–1671 and 89–1672.

United States Court of Appeals,
Second Circuit.

Argued May 23, 1990.

Decided Sept. 17, 1990.

Colleen P. Cassidy, Legal Aid Soc., Federal Defender Services Unit, New York City, for defendant-appellant.

James B. Comey, Asst. U.S. Atty., New York City (Otto Obermaier, U.S. Atty., S.D. N.Y., David E. Brodsky, Asst. U.S. Atty., on brief), for appellee.

Before VAN GRAAFEILAND, MESKILL and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Kourosh Bakhtiari appeals from judgments of conviction entered by two district court judges in the Southern District of New York. The first was entered by Judge Sand on November 28, 1989, three months after the defendant was convicted by a jury on all counts in a five-count indictment, S 88 Cr. 395. That indictment charged the defendant with possession of a silencer not identified with a serial number, in violation of 26 U.S.C. §§ 5845(a)(7) and 5861(i); possession of a loaded semi-automatic pistol and a silencer by an illegal alien, in violation of 18 U.S.C. § 922(g)(5); impersonating a State Department employee, in violation of 18 U.S.C. § 912; and making false statements, in violation of 18 U.S.C. § 1001. Judge Sand sentenced the defendant to imprisonment for 46 months on Counts One, Two and Three, and 36 months on Counts Four and Five, all terms to run concurrently. The district court also imposed a total of ten years supervised release, a $7,500 fine and special assessments totalling $250.

Bakhtiari also appeals from a judgment of conviction entered on December 19, 1989, by Judge Sweet upon the defendant's guilty pleas to two indictments charging him with escape. The first, 88 Cr. 889, charged Bakhtiari—and two other inmates—with conspiring to escape, in violation of 18 U.S.C. § 371, and with attempted escape, in violation of 18 U.S.C. § 751(a). The second indictment, 89 Cr. 227, charged Bakhtiari with escape from custody, in violation of 18 U.S.C. § 751(a). Judge Sweet sentenced him to imprisonment for 24 months and a $5,000 fine on both indictments to run concurrently but consecutive to the sentences imposed by Judge Sand. Judge Sweet also ordered the payment of special assessments totalling $150.

Bakhtiari now argues that Judge Sand improperly precluded a duress defense; that evidence of his guilt was insufficient; and that he was arrested without probable cause, thus invalidating a subsequent search. He also advances various challenges to the sentences imposed by Judges Sand and Sweet. We find no trial or pretrial error and thus affirm Bakhtiari's convictions in their entirety. Because we find a single error in the sentence imposed by Judge Sand, we remand the case under indictment S 88 Cr. 395 for resentencing.

## BACKGROUND

During the spring of 1988, Kourosh Bakhtiari, using the alias "Michael Anderson," negotiated with a real estate broker to purchase a Manhattan apartment. During the negotiations, Bakhtiari variously told the broker that he was employed by the United States State Department and the Department of Defense branch of the State Department. He discussed with the broker his need for certain security improvements to the building. The broker reported the foregoing to the Federal Bureau of Investigation ("FBI"), which opened an investigation. On June 14, 1988, federal agents, posing as a business associate and a lawyer, accompanied the broker to a meeting with Bakhtiari. The defendant arrived carrying a briefcase, which he placed on the floor near where the parties sat. The agent posing as the broker's lawyer told the defendant that he needed to see "Michael Anderson's" official identification and asked the defendant where he worked. Bakhtiari said that he worked for the "United States State Department." The agent asked the defendant to be more specific. Bakhtiari replied that he worked in the "Department of Defense ... a joint task force with the State Department." Bakhtiari was then arrested.

Before the defendant was placed in handcuffs, another agent entered the room and saw the defendant's briefcase, roughly six to eight feet from the defendant. The agent noticed a tag on the briefcase which said "FIREARM." Bakhtiari admitted that the briefcase contained a gun and then denied the agent permission to search the case, to which the agent responded, "[I]t doesn't matter, because we are going to secure the gun anyway." The briefcase contained a host of weapons—including an M–11 9 millimeter semi-automatic pistol containing a magazine loaded with ten rounds, a silencer for the gun, a knife, grenades, and a garrote—as well as bottles of strychnine and chloroform.

On November 1, 1988, Judge Sand held a hearing upon Bakhtiari's motion to suppress the contents of the briefcase based upon a search incidental to an arrest allegedly made without probable cause. However, after hearing proof of Bakhtiari's request that the agents "call [then Secretary of Defense] Frank Carlucci ... that this was a special operation and that [the defendant] couldn't talk about it and if [the agents] would call [Carlucci], [Carlucci] would clear it up," Judge Sand, with the consent of all parties, ordered a psychiatric examination of Bakhtiari. On November 20, Bakhtiari attempted to escape from the seventh floor of the Metropolitan Correctional Center in Manhattan by sliding down a makeshift rope woven from, among other things, dental floss. Three months later, while Bakhtiari was being treated at a hospital for wounds sustained in his futile escape effort, he successfully escaped and remained at large for three days.

After Bakhtiari's recapture and the completion of the psychiatric report, Judge Sand concluded the suppression hearing and denied the defendant's motion. He ruled that the search of the briefcase and seizure of the weapons were incident to a lawful arrest, since the government had probable cause on June 14 to believe that Bakhtiari had violated 18 U.S.C. § 912 by impersonating a State Department employee.

Prior to trial, the government moved to preclude Bakhtiari from presenting a defense based on alleged duress. Judge Sand conducted a hearing on August 1, 1989. For the purposes of the hearing, the government stipulated that Bakhtiari's father had held high office under the Shah of Iran and had been executed after the Shah's fall in 1979. The district court also assumed that "Bakhtiari had a good faith basis for believing that members of his family were threatened by persons acting for the present government of Iran."

Bakhtiari, the only defense witness at the hearing, claimed that he had been coerced into committing the charged crimes by the Iranian government, which allegedly had threatened his family. According to the defendant, who is Iranian, he received several phone calls prior to his arrest from unidentified individuals who explained that if Bakhtiari would help them obtain various chemicals, the caller would help the defendant's family travel to the United States.

Bakhtiari also testified that he was visited by an individual, claiming to represent the current government of Iran, who instructed him to obtain chemicals to be used in chemical warfare, asked for sophisticated silencers for machine guns and specially designed hand grenades, and told Bakhtiari to contact a Mr. Tabar at the Iranian Mission to the United Nations. Accompanied by a friend named Glenn Miller, Bakhtiari travelled from his home in Pennsylvania to New York to visit Tabar. At the meeting, Tabar allegedly showed Bakhtiari pictures of Bakhtiari's father being tortured in Iran in 1984. The defendant claimed that Tabar told him that the Iranian government would know if he "ever went to [the FBI]." Bakhtiari also claimed to have mailed to a subcommittee of the Senate Foreign Relations Committee a letter which, according to the defendant, "explained [his] predicament." While the defendant produced a general cover letter, he was unable to produce those pages he said he sent to the subcommittee explaining his situation—a lapse, he claimed, due to the FBI's failure to secure his apartment. The Foreign Relations Committee

had no record of any letter received from the defendant.

Bakhtiari explained his possession of the chemicals and the weapons at the time of his arrest:

> On ... June 12 or ... June 13, 1988 ... I accidentally spilled some of the chemicals [strychnine and chloroform] and I telephoned the chemical emergency ... number ... Before leaving for New York City [to meet Tabar], I realized that I possessed ... various dangerous and possibly illegal substances and weapons [at my residence] and that there might be an investigation relating to the chemicals that I had spilled ... By this time I had also agreed to experiment with a handgun and silencer as part of [ ] another project for the Iranians ...

Bakhtiari admitted that no one had asked him to obtain the gun; he said he needed it to design the silencer.

At the hearing, Bakhtiari also testified that, in May or June of 1988, he had discussed the Iranian threats with his associate Glenn Miller and had asked Miller, in the event Bakhtiari was harmed, to retrieve a letter Bakhtiari had written to himself and turn it over to the authorities. During a recess, however, the government and Bakhtiari's counsel spoke to Miller by phone. Miller denied any recollection of a letter and any discussions with Bakhtiari about the alleged threats from the Iranian government. Neither side called Miller as a witness at the hearing.

Finally, Bakhtiari did not claim a direct connection between any alleged threats from the Iranian government and his efforts to obtain an apartment in Manhattan. Instead, the defendant contended that his impersonation of a State Department official resulted from his concern for his family's safety; he felt a high-security apartment would ensure their well-being. At the hearing's conclusion, Judge Sand precluded the defendant from presenting a duress defense.

The government's evidence at trial, in addition to tracking substantially that offered at the suppression hearing, established that at the time of his arrest, Bakhtiari was in this country illegally as his student visa extension had expired on January 1, 1984. The defense called no witnesses.

## DISCUSSION

■ Bakhtiari first challenges the district court's preclusion of his attempted defense of duress or coercion. At the outset, we note that Judge Sand appropriately held a pre-trial hearing of the type we approved in *United States v. Bifield*, 702 F.2d 342, 346–347 (2d Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983), and authorized by the Supreme Court in *United States v. Bailey*, 444 U.S. 394, 416, 100 S.Ct. 624, 638, 62 L.Ed.2d 575 (1979), to determine whether the evidence of duress or coercion was sufficient to raise a jury issue. This procedure enabled him, upon finding that the defense failed as a matter of law, to preclude the evidence and thereby avoid unnecessary jury confusion. *See Bifield*, 702 F.2d at 347; *United States v. Alicea*, 837 F.2d 103, 107 (2d Cir.), *cert. denied*, 488 U.S. 832, 109 S.Ct. 88, 102 L.Ed.2d 64 (1988) ("[W]here the evidence would be insufficient to warrant a jury charge on the defense [it is] excluded at trial ...").

> The defense of duress or coercion constitutes a legal excuse for criminal conduct when, at the time the conduct occurred, the defendant was subject to actual or threatened force of such a nature as to induce a well-founded fear of impending death or serious bodily harm from which there was no reasonable opportunity to escape other than by engaging in the otherwise unlawful activity.

*United States v. Mitchell*, 725 F.2d 832, 837 (2d Cir.1983) (quoting *United States v. Agard*, 605 F.2d 665, 667 (2d Cir.1979)). Like the Ninth Circuit, we believe, albeit under conditions not present here, that a claim that a defendant's family has been threatened might help establish the defense of duress or coercion. *See United States v. Contento–Pachon*, 723 F.2d 691, 694 (9th Cir.1984); LaFave & Scott, *Criminal Law*, § 5.3 at 433, 436 & n. 30. A defendant, however, "must present some evidence on all of the elements of the de-

fense," including the distinct "element of lack of a reasonable opportunity to escape the threatening situation ..." *United States v. Patrick*, 542 F.2d 381, 388 (7th Cir.1976). "[W]here there is reasonable opportunity to escape the threatened harm, the defendant must take reasonable steps to avail himself of that opportunity, whether by flight or by seeking the intervention of the appropriate authorities." *Alicea*, 837 F.2d at 106. This Bakhtiari wholly failed to do.

Bakhtiari claimed that, as early as December of 1987, unidentified Iranians threatened him and his family unless he assisted the Iranians in obtaining certain chemicals. Bakhtiari also claimed that he "had also agreed to experiment with a handgun and silencer as part of another project for the Iranians," and that he had been asked to provide "sophisticated silencers for machine guns ... [and] specially designed hand grenades ..." He testified that he mailed a letter to a subcommittee of the Senate Foreign Relations Committee describing the threats against him and his family. However, Judge Sand properly concluded that this evidence was insufficient to establish that Bakhtiari took reasonable steps to escape the threatened harm or to alert the proper authorities to his predicament. It is undisputed that Bakhtiari never communicated the alleged threats to any federal, state or local law enforcement authority. As for the single letter he says he mailed to the Senate, the subcommittee has no record of receiving it and Bakhtiari was unable to produce a copy at the suppression hearing. We have no hesitancy in concluding that, under the facts of this case, the unsupported evidence of the single letter sent to the subcommittee falls far short of the necessary threshold showing or reasonable steps to alert the authorities that would require a district court to permit the defense to go to a jury.

Relying on *United States v. Contento-Pachon, supra*, Bakhtiari further argues that, because his family members "were not within the jurisdiction of the United States, it would have served no purpose to go to the United States authorities." His reliance on *Contento-Pachon* is misplaced.

There, the Ninth Circuit concluded that the possibility that the Colombian police were paid informants for drug traffickers created a jury issue as to the reasonableness of seeking assistance from the Colombian police. Bakhtiari ignores the fact that in *Contento-Pachon*, the defendant himself was in Colombia, not the United States; the available avenues to official assistance were considerably more circumscribed there than they were in this case. Moreover, nowhere in that opinion did the Ninth Circuit excuse a defendant from contacting United States law enforcement officials before committing crimes in the United States when reasonable opportunities for doing so existed; the issue here, after all, is not whether Bakhtiari should have contacted *Iranian* officials. We decline to adopt the conclusion appellant implicitly urges—that contacting law enforcement officials is tantamount to abandoning any hope of securing the safe return of a threatened family member.

Finally, Bakhtiari conceded at the hearing that there was no direct connection between the alleged Iranian coercion and his possession of the semi-automatic pistol or his impersonation and false statements made in connection with the Manhattan apartment. Thus, not only did Bakhtiari completely fail to take adequate, reasonable steps to notify law enforcement officials of the alleged threats against him and his family, but he also took affirmative steps to commit additional crimes never even contemplated by the unidentified Iranians. Under these circumstances, Judge Sand's pre-trial rejection of the coercion or duress defense was entirely proper.

■ Bakhtiari also challenges the sufficiency of the evidence in support of his convictions on the false personation and false statements counts. The defendant's burden is a heavy one, since the evidence must be viewed in the light most favorable to the government, *see, e.g., Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), with all reasonable inferences drawn in favor of the verdict. *See, e.g., United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir.), *cert. denied,*

464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983).

■ As to the false personation counts, the government was required to establish that the defendant pretended to be an officer or employee of the government and that he acted pursuant to his assumed authority—in other words, that he committed some overt act. *See, e.g., United States v. Harmon*, 496 F.2d 20, 21 (2d Cir.1974). The evidence established that Bakhtiari claimed, on more than one occasion, with both the apartment building's broker and her "associates"—who were in fact undercover agents—to work for the State Department. Posing as a State Department employee, the defendant then negotiated for an apartment. We reject appellant's contention that his statements represent little more than bravado. For instance, one of the broker's "associates" asked Bakhtiari for identification. He then asked Bakhtiari where he worked and, when Bakhtiari replied the State Department, he asked the defendant to be more specific. Bakhtiari then responded that he worked for a joint Task Force of the State and Defense Departments. It was well within the jury's province to conclude—from that testimony alone—that Bakhtiari expected the building's broker and her "associate" to rely on his purported identity as a federal official in the negotiations, and knew that they were thus willing to discuss seriously both the availability of an apartment and the possibility of security improvements to the building because of Bakhtiari's purported position. A reasonable jury could therefore fairly conclude that, by claiming to work for the State Department and by negotiating to purchase an apartment in that capacity, Bakhtiari hoped to gain access to an apartment and other advantages that would not otherwise have been available to him had he identified himself as an illegal alien, and that he thus committed "an overt act that assert[ed], implicitly or explicitly, authority that [he]

claim[ed] to have by virtue of the office he pretend[ed] to hold ..." *United States v. Rosser*, 528 F.2d 652, 656 (D.C.Cir.1976). The jury was also free to conclude that, in the context of the negotiations testified to at trial, Bakhtiari was engaging in more than "mere bravado," *United States v. Wells*, 893 F.2d 535, 538 (2d Cir.1990); *Rosser*, 528 F.2d at 658, and was relying on the fact that the general public holds federal officials in high regard.

■ Bakhtiari next challenges his conviction for violating the false statements statute, 18 U.S.C. § 1001, which provides, in relevant part, that "[w]hoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false ... statements or representations ... shall be fined not more than $10,000 or imprisoned not more than five years, or both." Appellant argues that "implicit in [the jurisdictional element of § 1001] is the requirement that it be at least reasonably foreseeable that the declarant is involved in a matter with[in] the jurisdiction of a federal agency." We disagree.

In *United States v. Yermian*, 468 U.S. 63, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984), the Supreme Court addressed the issue of a defendant's knowledge of the jurisdictional element of the false statements statute. Based on both the plain language of the statute and its legislative history, the Court decided that "proof of actual knowledge of federal agency jurisdiction is not required under § 1001." *Id.* at 75, 104 S.Ct. at 2942. Appellant correctly notes that *Yermian* specifically left open the question of whether some lesser standard of culpability must be read into the statute. *See id.* at 75 n. 14, 104 S.Ct. at 2943 n. 14; *see also Liparota v. United States*, 471 U.S. 419, 432, 105 S.Ct. 2084, 2091, 85 L.Ed.2d 434 (1985) ("[T]he Court explicitly reserved the question whether *some* culpability was necessary with respect even to the jurisdictional element.").[1] The footnote in the *Yermian*

---

1. *Liparota's* holding is unrelated to the case at bar. There, the Court required the government, in a prosecution for food stamp fraud pursuant to 7 U.S.C. § 2024(b)(1), to establish that the

defendant knew that his acquisition or possession of food stamps was in a manner not authorized by statute or regulations. In *Liparota*, the government relied in part on *Yermian* in an

opinion, the fact that the decision was decided by a bare 5–4 majority that included justices no longer on the Court, and the language in *Liparota* have led at least one judge to go so far as to conclude—incorrectly, in our view—that *Yermian* is no longer good law. *See United States v. Gibson,* 881 F.2d 318, 324 (6th Cir.1989) (Merritt, J., dissenting). Whatever the future of *Yermian*'s holding in the Supreme Court, it is our task to apply it and accept its clear implications until the Supreme Court decides otherwise. "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to the [Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989). We agree with three of our sister circuits, the Sixth, *United States v. Gibson,* 881 F.2d at 323, the Eleventh, *United States v. Suggs,* 755 F.2d 1538, 1542 (11th Cir.1985), and the Ninth, *United States v. Green,* 745 F.2d 1205, 1209 (9th Cir.1984), *cert. denied,* 474 U.S. 925, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985), and hold today that no mental state is required with respect to federal involvement in order to establish a violation of § 1001.

While the Supreme Court in *Yermian* did not have to decide whether some standard of jurisdictional awareness less than actual knowledge is required, its opinion nonetheless provides strong support for our conclusion that it is not.

The jurisdictional language was added to the current provision *solely to limit the reach of the false-statements statute to matters of federal interest* ... Whether or not [appellant] fairly may characterize the intentional and deliberate lies prohibited by the statute (and manifest in this case) as "wholly innocent conduct," this argument is not sufficient to overcome the express statutory language of § 1001. [Appellant] does not argue that Congress lacks the power to impose criminal sanctions for deliberately false statements submitted to a federal agency, *regardless of whether the person who made such statements actually knew that they were being submitted to the Federal Government.* That is precisely what Congress has done here.

*Yermian,* 468 U.S. at 74–75, 104 S.Ct. at 2942–43 (emphasis added, citation omitted).

Although somewhat conflicting language is discernible in *Yermian, see* 468 U.S. at 75 n. 14, 104 S.Ct. at 2943 n. 14, the Court's opinion, read as a whole, leaves no doubt that Congress—through § 1001—acted within its powers to criminalize the issuance of an intentionally false statement within the jurisdiction of a federal department or agency, regardless of the defendant's awareness that the statement will be so delivered. The footnote in *Yermian* relied upon by appellant establishes only that the defendant in that case at the very least got more than he deserved—a jury instruction on reasonable foreseeability. The dissent in *Yermian*—on which appellant also relies—misreads the majority's opinion as "proceed[ing] on the assumption that *some* lesser culpability standard is required in § 1001 prosecutions...." *Id.* at

---

attempt to avoid having to establish actual knowledge. In rejecting the government's position, the Court noted that *Yermian* "explicitly reserved the question whether *some* culpability was necessary with respect even to the jurisdictional element." 471 U.S. at 432, 105 S.Ct. at 2091. However, nothing in *Liparota* sheds any doubt on our conclusion today. Beyond that, the *Liparota* Court noted substantive distinctions between that case and *Yermian.* Unlike *Yermian,* the government in *Liparota* argued "that *no mens rea* [emphasis in original] is required with respect to *any* [emphasis added] element of the crime. Finally, *Yermian* found

that the statutory language was unambiguous and that the legislative history supported its interpretation." *Id.* There is, of course, a *mens rea* requirement in prosecutions under § 1001, as Judge Sand properly instructed the jury: "[T]he government *must prove beyond a reasonable doubt ... that the defendant knew that the statement or representation was false, fictitious, or fraudulent, and that he acted willfully.... [A]n act is done knowingly if it is done voluntarily and purposely.... An act is done willfully if it is done knowingly, intentionally, and with a bad purpose ..."

76, 104 S.Ct. at 2943 (Rehnquist, J., dissenting). No such assumption is made; rather, the Court simply notes what it has not been called on to decide. To the contrary, the majority opinion strongly suggests that *no* culpability standard is appropriate with regard to the jurisdictional element of the statute.

That conclusion, moreover, is the only one that can be squared with the plain language of the statute itself. If Congress had intended to include a reasonable foreseeability element in the jurisdictional portion of the statute, then it could easily have done so. As the statute stands, the government must prove the statement false, that it involved a matter within federal agency jurisdiction at the time it was made, and that the defendant "knowingly and willfully" made the false statement. The government's burden in the present case, while not as severe as the defendant would like, is not insubstantial.

The legislative history of § 1001 also lends support to our conclusion, as it suggests that Congress intended the statute to be read broadly. In 1926, the predecessor act to § 1001 was interpreted narrowly by the Supreme Court to proscribe only false statements made with intent to cause pecuniary or property loss to the federal government. *See United States v. Cohn,* 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616 (1926). *Cohn* rejected the government's contention that the act should be read broadly to prohibit any interference with one of the government's functions. *Id.* at 346, 46 S.Ct. at 253. In response to the Court's narrow reading, Congress eventually amended the act by omitting the specific intent language and thus extended the act's coverage to deceptive practices not only that were intended to cause pecuniary or property loss to the government, but also those which might frustrate government functions. *See United States v. Gilliland,* 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941) ("The statute was made to embrace false and fraudulent statements or representations ... [with] no restriction to cases involving pecuniary or property loss to the government."). As the Court recently explained, "Noticeably lack-

ing from [the amendment] is any requirement that the prohibited conduct be undertaken with specific intent *to deceive* the Federal Government, or with *actual knowledge* that false statements were made in a matter within federal agency jurisdiction." *Yermian,* 468 U.S. at 73, 104 S.Ct. at 2941. "That Congress did not include such language," *id.,* and chose not to include a reasonable foreseeability requirement either, "provides convincing evidence that the statute does not require actual knowledge," *id.,* or even proof that federal jurisdiction was reasonably foreseeable.

In addition, the Supreme Court has consistently held that the jurisdictional clause of § 1001 should be given a broad interpretation. *See United States v. Rodgers,* 466 U.S. 475, 479–84, 104 S.Ct. 1942, 1946–49, 80 L.Ed.2d 492 (1984); *Bryson v. United States,* 396 U.S. 64, 71, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969); *see also United States v. Bramblett,* 348 U.S. 503, 507, 75 S.Ct. 504, 507, 99 L.Ed. 594 (1955) ("There is no indication in either the committee reports or in the congressional debates that the scope of the statute was to be in any way restricted."). Moreover, "[i]n the unlikely event that § 1001 could be the basis for imposing an unduly harsh result on those who intentionally make false statements to the Federal Government, it is for Congress and not this Court to amend the criminal statute." *Yermian,* 468 U.S. at 75, 104 S.Ct. at 2943 (footnote omitted).

■ In a final attempt to overturn his § 1001 convictions, Bakhtiari seeks protection behind the so-called "exculpatory no" doctrine, which holds that the second element of a § 1001 offense—the making of a statement—is lacking if the defendant merely answers an inquiry in the negative rather than by affirmatively supplying information. Appellant recognizes that this argument applies only to his false *post*-arrest statements. While we thus need not reach this argument because we have upheld his convictions on the basis of his pre-arrest statements, we nonetheless note in passing that we have previously ruled that even "if we did adopt [the 'exculpatory

no' doctrine] we would construe it narrowly, ruling that any statement beyond a simple 'no' does not fall within the exception." *United States v. Capo,* 791 F.2d 1054, 1069 (2d Cir.1986), *reversed in part on other grounds,* 817 F.2d 947 (2d Cir.1987) (en banc) (citations omitted). Bakhtiari did much more than simply say "no" in response to the federal agent's post-arrest questions.

■ We also have little trouble dismissing Bakhtiari's contention that the undercover agents lacked probable cause to arrest him for impersonating a State Department employee because they had no reason to believe that he had "acted" as a government official. Bakhtiari himself admits that, immediately before his arrest, he falsely claimed to work for the State Department. The agents were also aware that, prior to the final meeting on June 14, Bakhtiari had claimed to be a State Department official in order to facilitate his purchase of an apartment in a building with specific and special security provisions. And given the undercover agents' insistence that Bakhtiari provide identification before the negotiations continued, it was reasonable to conclude that Bakhtiari realized that claiming to be a federal official might help hasten—and, indeed, may have been necessary to guarantee—the deal's completion. "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13. Consequently, the arrest was lawful, and the search of Bakhtiari's briefcase incident to his arrest was entirely appropriate.

■ Bakhtiari also challenges several aspects of his sentences, only one of which has merit. He first contends that Counts One and Three, charging him with possession of the silencer, and Count Two, charging him with possession of the semi-automatic pistol, should have been grouped together for sentencing purposes because they involve "substantially the same harm" within the meaning of § 3D1.2. Under that section of the Guidelines, the district court must group various counts together

for purposes of sentencing if they involve "substantially the same harm." Appellant's contention to the contrary notwithstanding, the possession of a semi-automatic pistol and the possession of a silencer do not involve "substantially the same harm." As the government properly notes, a silencer transforms an unmuffled gun into a far more threatening weapon. *See United States v. Pope,* 871 F.2d 506, 510 (5th Cir. 1989) ("[T]he possession of an unregistered silencer and the unlawful possession of a pistol by a felon involve two distinct harms and different societal interest.").

■ Defendant similarly argues that Judge Sweet should have grouped the two escapes. He relies on § 3D1.2(c) of the Guidelines, which provides that counts shall be grouped together when "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." The government concedes that Judge Sweet relied upon the second escape for an obstruction adjustment to the guideline calculation for the first escape charge. We conclude, however, that the district court did not impermissibly engage in "double-counting," because Application Note 5 to § 3D1.2 explains that the grouping procedure urged by appellant here "applies only if the offenses are closely related." Escaping from custody on two occasions, separated by three months, are two separate offenses that fully merit separate, cumulative punishment. The offenses are not "closely related" for the purposes of § 3D1.2.

■ Bakhtiari next challenges the six-level upward adjustment in the offense level for the impersonation offense, pursuant to § 2J1.4, for seeking to obtain a thing of value, and the four-level upward adjustment in the offense level for the false statements offense. He concedes that if the latter adjustment was correct, then any error in the former was harmless, since the impersonation and false statements counts were grouped together pursuant to §§ 3D1.1–4 and would have received the same combined offense level regardless of whether the impersonation count was at

level 12 or at level 6. We turn, then, to the four-level upward adjustment in the false statements offense, made pursuant to §§ 2F1.1(b)(2)(A) and (b)(3)(A), which provide for upward adjustments if the offense involved "more than minimal planning" and a "misrepresentation that the defendant was acting on behalf of … a government agency."

As the Probation Department determined, in a report undisputed by Bakhtiari, prior to his arrest Bakhtiari had numerous contacts with the real estate broker over a period of several weeks. In his assumed identity, he provided false information concerning his security needs and the government's role in securing and financing the apartment. " 'More than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." *See* Guidelines § 1B1.1, Application Note 1(f). As we explained earlier, these actions violated 18 U.S.C. §§ 912 and 1001. His actions during the weeks preceding his arrest, then, related to his plan to violate both these statutes. Under these circumstances, we have little trouble affirming Judge Sand's upward adjustment on the bases of "more than minimal planning" and a "misrepresentation that the defendant was acting on behalf of … a government agency." Accordingly, we need not reach the impersonation adjustment.

■ Bakhtiari also challenges the two-level increase he received for obstruction of justice because, he argues, there was no proof that the chemicals and electrical components that he directed an associate to remove from his apartment were material to the government's investigation. "[A] district court's determination of whether a defendant obstructed justice is typically reviewed as a factual finding under the clearly erroneous standard" except where the question turns "primarily on the legal interpretation of a guideline term." *United States v. Stroud,* 893 F.2d 504, 507 (2d Cir.1990) (citations omitted). Based on the materials found in Bakhtiari's briefcase and in his apartment, and based on the nature of the government's investigation, Judge Sand reasonably concluded that Bakhtiari's actions—using a prison telephone to instruct an associate to remove chemicals and electrical components from Bakhtiari's apartment—were intended "to destroy or conceal material evidence," § 3C1.1 Application Note 1(b), and thus obstruct justice.

■ We do find merit, however, in Bakhtiari's contention that the offense level for the silencer offenses was improperly increased by one level, pursuant to § 2K2.2, for possessing a silencer with an "obliterated serial number." There was no evidence that the silencer had ever had a serial number, nor that the defendant had ever "obliterated" that serial number. To be sure, the government's position on this score has some logical force—a court should treat similarly on the one hand a defendant who affirmatively obliterates a serial number and, on the other, one who personally designs a silencer and never affixes a serial number in the first place. We are bound, however, by the provision the Sentencing Commission did in fact adopt, and that provision specifically applies only to those firearms which "[were] stolen or [have] an altered or obliterated serial number." § 2K2.2(b)(2). Accordingly, we remand this portion of the defendant's sentence to Judge Sand to determine whether Bakhtiari ever obliterated a serial number on the silencer or whether the silencer never had a serial number. If it is the latter, then any upward adjustment pursuant to § 2K2.2(b)(2) is inappropriate.

## CONCLUSION

For the reasons set forth above, appellant's conviction on all counts is affirmed, as is the sentence imposed by Judge Sweet. The sentence imposed by Judge Sand, while substantially affirmed, is vacated in part and the appellant's case remanded for further action consistent with this opinion.