**UNITED STATES of America**

v.

**Bernard CHRISTIAN a/k/a "Chase."**

**Cr. No. L–92–0370.**

United States District Court,
D. Maryland.

Jan. 6, 1994.

Robert T. Durkin, Baltimore, MD, for defendant.

Lynne A. Battaglia, U.S. Atty. and Thomas M. DiViagio, Asst. U.S. Atty., Baltimore, MD, for the U.S.

## MEMORANDUM & ORDER

LEGG, District Judge.

At the close of evidence during trial, defendant Bernard Christian moved the Court to instruct the jury on the affirmative defense of duress. Ruling that the evidence presented at trial was insufficient to support the defense, the Court denied the motion. Ultimately, the jury found Christian guilty on all three counts in the superseding indictment.[1] In ruling orally, the Court reserved the right to substitute a written opinion. This is that opinion.

### I. FACTS

On September 16, 1992, Bernard Christian alighted at Baltimore's Pennsylvania Station from a train that originated in New York City. A plain-clothes Baltimore City police officer, who was attracted by Christian's nervousness, approached and asked if he could search Christian's bag.[2] Christian consented to the search. Upon discovering two nine millimeter semiautomatic pistols, the officer arrested Christian. After being placed in a holding cell at the railway station, Christian hailed a jail keeper and said that he wished to cooperate with the police.

That night, during interviews with law enforcement personnel,[3] Christian explained

---

**1.** Count I charges conspiracy to use interstate facilities in the commission of a murder for hire (18 U.S.C. §§ 371, 1958). Count II charges aiding and abetting in the use of interstate facilities in the commission of a murder for hire (18 U.S.C. §§ 2, 1958). Count III charges aiding and abetting in the use and carrying of a firearm during and in relation to a crime of violence, namely the use of interstate facilities in the commission of a murder for hire (18 U.S.C. §§ 2, 1958, 924(c)).

**2.** The Baltimore Amtrak station is a major link in the New York-to-Baltimore drug trade. A unit of

the Baltimore City Police Department's drug interdiction squad watches disembarking passengers for suspicious behavior. Christian does not contend that the search of his bag violated his constitutional rights.

**3.** Christian spoke with members of the Baltimore City Police, the Drug Enforcement Agency, and the United States Attorney's Office for the District of Maryland.

that he was involved in a scheme to murder two Baltimore men. He had been assigned the task of carrying the murder weapons into the city. The actual "trigger men," two Jamaican males from New York, were traveling to Baltimore by car. The intended victims of this plan, Christian said, were two local drug dealers who owed money to a drug supplier in New York City.[4]

The Drug Enforcement Administration ("DEA"), in cooperation with the Baltimore City Police Department, placed Christian in a hotel room in downtown Baltimore. With Christian's permission,[5] the DEA wired the room for video and audio taping. After Christian placed a telephone call, two men, Steven Cox and Mario Martinez, came to the hotel room. The two Jamaican "trigger men," Calvin Deaire and Floyd Sinclair a/k/a Peter Brown, were leery of the hotel room and elected to spend the night in a rented white van parked in the hotel lot. During the night of September 16th and the morning of the 17th, Christian, Cox, and Martinez were taped planning the murders.[6]

The next morning, September 17th, the authorities arrested the aforementioned individuals as well as Thomas Faulkner, a local drug dealer whose job was to locate the murder targets.[7] Christian eventually signed a plea agreement with the government in which he agreed, in exchange for a reduced sentence, to plead guilty and inform on his former colleagues. In February, 1993,

however, the government abrogated the agreement after Christian conceded that he had lied during a proffer session.[8] Christian was permitted to change his plea from "guilty" to "not guilty."

Christian stood trial in November, 1993 for his role in the conspiracy, and the Court allowed him to present evidence on the defense of duress.[9] Christian took the stand and testified that he was a former member of a Jamaican gang (the "Uprising Posse"), headed by Cox. Although he had disassociated himself from the Posse, Christian stated, Cox came to his apartment on September 15, 1992, and asked him to participate in the Baltimore scheme. Christian testified that on two earlier occasions he had been shot by Cox—once in the shoulder and once in the leg. Thus, Christian claimed that he was forced to carry the guns to Baltimore because he feared that Cox would kill (or seriously injure) him if he refused.

After hearing the evidence and deciding that it was insufficient to warrant an instruction, the Court advised the jurors that they could not consider the defense of duress in their deliberations.

## CHRISTIAN'S TESTIMONY

The Court now sets forth the essentials of the testimony of Christian, his mother, and Glenn Ehasz, a private detective in defendant's employ. The testimony concerned not

---

4. That night, Seven Cox and Mario Martinez, whom Christian identified as enforcers for a New York drug dealer, Emmanuel Umegbolu, drove from the Bronx to Baltimore. Accompanying them were two Jamaicans, Calvin Deaire and Floyd Sinclair, whom Christian identified as hit men specially hired by Cox and Umegbolu for the Baltimore job.

5. Christian conceded that he consented to the audio and video taping.

6. Calvin Deaire came to the room briefly to use the bathroom.

7. Cox, Martinez and Sinclair were tried jointly in this Court. Cox and Martinez were convicted; Sinclair was acquitted. Deaire and Faulkner pled guilty and have been sentenced. The alleged New York drug supplier, Emmanuel Umegbolu, is in custody in Canada and awaiting extradition.

8. At trial, Christian told the prosecutor that Cox and Martinez had committed an unrelated murder in New York. In this respect, Christian's story was a lie. Christian testified that he fabricated the story about the other murders because he hoped that Cox would be "sent away for a long time." If Cox and Martinez were incarcerated, Christian said, they would be unable to retaliate against him and his family.

9. Prior to opening statements, the Court advised Christian that duress was an affirmative defense, that he bore the burden of proof by a preponderance of the evidence, and that it was possible that the Court, after hearing the evidence, might disallow the defense. Christian acknowledged that he understood this risk but stated that he wished to proceed with the defense anyway. Neither party asked the Court to determine pretrial the legal sufficiency of the duress evidence. Both sides requested the Court to rule after hearing the evidence at trial.

only the immediate facts surrounding Christian's arrest but also his early years living in the Bronx.

Christian and Cox were in grade school together in the Bronx. The Bronx is a violent, drug and firearm infested neighborhood where the police are seldom in evidence. Glenn Ehasz, the private detective, lived in the Bronx as a boy; he testified that the Bronx has become a "very scary place."

Christian and Cox did many "bad things" together as boys. Later, as young men, they became involved in the "Uprising Posse," which sold guns and drugs. Cox managed the business of the gang, and, prior to December, 1990, Christian served as Cox's bodyguard. As the gang's tactics became increasingly violent, however, Christian, encouraged by his mother, sought a way to withdraw without getting killed in retaliation.

Christian sought assistance from a local police detective who knew his family. The detective, who had retired, referred Christian to Detective Sal LaFerri, who offered to help extricate Christian from the gang if Christian would act as an informant for the police. Christian approached the police warily because many Bronx police officers were "under the thumb" of Cox. Indeed, Cox's girlfriend was a police lieutenant who once tipped him off as to an imminent raid. Despite the personal risk he faced, Christian was a valuable informant. A tip from Christian enabled the police to raid Cox's home and make thirteen drug arrests.

Later, in the fall or winter of 1990, Christian warned Detective LaFerri of Cox's plan to travel to Florida to break into a warehouse where the DEA and FBI stored seized drugs. Upon hearing this, the detective introduced Christian to Mary Galligan, a special agent for the FBI. Galligan instructed Christian to contact her when he arrived in Florida for the planned robbery.[10]

Because of the suddenness of his departure for Florida with Cox, Christian did not have enough time to phone Galligan. In Florida, Christian stayed with his aunt in Fort Lauderdale while Cox went to survey the warehouse. Upon Cox's return, Cox told Christian that the job could not be done because security was too tight. Cox then asked for the return of $10,000 that he had "fronted" to Christian for this job. When Christian refused the request, Cox stranded Christian in Florida.

While still in Fort Lauderdale, Christian was shot in the shoulder by a man pretending to ask for directions. Christian theorized that the man had been sent by Cox in retaliation for Christian's failure to return the $10,-000 fronted to him for the aborted job. Christian was admitted to a local hospital for treatment of the gunshot wounds.

Upon his return from Florida, Christian decided to forsake criminal activity and pursue his G.E.D. degree at Bronx Community College. Special Agent Galligan allegedly stayed in contact with Christian by phoning him at the college twice a week. Upon receiving his G.E.D., Christian moved to Brooklyn and started working as a security guard at the Jacob Javitts Center in Manhattan. He testified that by moving out of the Bronx and by securing legal employment he was attempting to withdraw from the Uprising Posse.

Nevertheless, after Christian had moved to Brooklyn, Cox repeatedly phoned to enlist him in criminal projects. Christian said he always declined. Later, in March 1992, however, Cox, who was "wired" on drugs and acting irrationally, appeared at Christian's apartment, accused Christian of being responsible (as an informant) for a bust in which Cox had lost drugs, and shot Christian in the leg. Christian was seriously injured. Six months later, in September, 1992, Cox again arrived at Christian's apartment. Cox promised that if Christian accompanied him to Baltimore to commit two murders, Cox would consider any debts (occasioned by drugs lost in the raids) repaid. Although Christian testified that he did not in fact owe Cox any money (and had not informed on

---

10. During the government's rebuttal case, Special Agent Galligan disputed most of Christian's story. According to her, Christian falsely claimed to be working for her whenever he was picked up by the police. His stories never "checked out," and she told him not to call her or use her name again.

Cox), he agreed to accompany Cox to Baltimore. Christian was afraid that Cox, who had shot him once, would shoot him again if he refused to participate.

Cox assigned Christian the job of transporting the guns to Baltimore. On the night of September 15, 1992, Christian received the two nine millimeter pistols from their owners, Deaire and Sinclair. He was to take the guns to Baltimore by train the next day. Christian attempted to phone Galligan that night but was informed by a taped message that the FBI office had moved to Long Island.[11] Christian did not attempt to contact any other FBI agents or law enforcement officers. The next morning, on September 16, 1992, Cox met Christian. They were together for the entire morning until Cox dropped off Christian at the train station for the trip to Baltimore.

Christian waited several hours for the train, which departed around 4:00 pm.[12] He said he was afraid to attempt another call to Special Agent Galligan because of two suspicious men who appeared to be watching him. The men boarded Christian's train, and he surmised that they were monitoring him on behalf of a suspicious Cox. The men did not detrain in Baltimore, however, but continued on toward Washington. Christian admitted that he had no intention of alerting the authorities in Baltimore about the planned murder. Had he not been stopped at the station, he would have completed his mission and the two Baltimore men would have been killed.

Christian was arrested at the Baltimore Amtrak station for firearms possession. Christian told the police that he had been forced to travel to Baltimore because he feared that Cox would kill him if he did not. Thus, Christian claims that he acted under duress. The Court must decide whether, as a matter of law, Christian has proffered sufficient evidence of all three elements of the duress defense to warrant a jury instruction.

## II. DISCUSSION

### A. *Duress*

 According to most federal circuit courts, the defense of duress is composed of three elements: (1) an immediate threat of death or serious bodily injury; (2) a well-grounded fear that the threat will be carried out; and (3) no reasonable opportunity to escape the threatened harm. Duress is an affirmative defense; a defendant has the burden of proving its essential elements by a preponderance of the evidence. *United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir.1990), *cert. denied*, 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991); *United States v. Santos*, 932 F.2d 244, 249 (3d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 592, 116 L.Ed.2d 617 (1991); *United States v. Tanner*, 941 F.2d 574, 587 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 432 (1992); *United States v. Neal*, 990 F.2d 355, 358–59 (8th Cir.1993); *United States v. Charmley*, 764 F.2d 675, 676 (9th Cir.1985); *United States v. Scott*, 901 F.2d 871, 873 (10th Cir.1990); *United States v. Herre*, 930 F.2d 836, 838 (11th Cir.1991); *United States v. Jenrette*, 744 F.2d 817, 820–21 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985).

 When a defendant claiming duress has escaped from prison, a fourth element may be required: the defendant must submit to proper authorities after attaining a position of safety. *United States v. Peltier*, 693 F.2d 96, 98 (9th Cir.1982). *See also United States v. Bailey*, 444 U.S. 394, 412–13, 100 S.Ct. 624, 635–36, 62 L.Ed.2d 575 (1980) (holding that an essential element of the duress defense in an escape context is a "bona fide effort to surrender or return to custody as soon as the claimed duress ... has lost its coercive force"). In a non-escape case such as this one, the third and fourth elements merge into a single requirement that the defendant take any reasonable opportunity to avoid committing the contem-

---

11. Special Agent Galligan testified that, although her office had in fact moved to Long Island, Christian's call would have been answered by an FBI operator who would have then transferred the call to Galligan's new office.

12. Christian first stated that Cox dropped him off at the station at about 11:00 a.m. On cross-examination, however, he stated that he had been dropped off shortly before the train departed. The Court need not decide this factual issue.

plated crime or to notify the proper authorities. *See United States v. Contento–Pachon,* 723 F.2d 691, 693 (9th Cir.1984).

To satisfy a threshold showing of duress, a defendant must introduce sufficient evidence of all three elements of the defense. *Tanner,* 941 F.2d at 588. *See also United States v. Bailey,* 444 U.S. 394, 415, 100 S.Ct. 624, 637, 62 L.Ed.2d 575 (1980). A district court may refuse to instruct the jury on the duress defense if the court determines that the proffered evidence is insufficient as a matter of law. *Herre,* 930 F.2d at 838; *Tanner,* 941 F.2d at 588; *Contento–Pachon,* 723 F.2d at 693; *Bakhtiari,* 913 F.2d at 1057; *Jenrette,* 744 F.2d at 821; *Peltier,* 693 F.2d at 98; *Bailey,* 444 U.S. at 415, 100 S.Ct. at 637; *United States v. Bifield,* 702 F.2d 342, 347 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). The Court must now determine whether Christian has proffered sufficient evidence of the three elements of the duress defense.

**B.** *Analysis of the Proffered Duress Evidence*

The Court concludes that Christian has failed to produce sufficient evidence to support any of the three elements of duress. The Court will address each element seriatim.

First, assuming *arguendo* that Cox did threaten Christian, the threat was not direct or immediate. Even crediting Christian's testimony, Cox did not explicitly threaten to kill or injure Christian if he refused to participate in the Baltimore plan. Any threat was implied at best.[13]

Second, Christian did not have a well-grounded fear that any threat would be executed. Christian testified that while he was living in Brooklyn and working in Manhattan (and allegedly distancing himself from the Uprising Posse) he declined Cox's numerous invitations to participate in criminal forays. Yet, Christian conceded that he was never injured as a result of these refusals.

Finally, Christian repeatedly passed up reasonable opportunities either to escape the threatened harm or to notify the authorities. If Christian's testimony is credited, he was stymied in his effort to contact Special Agent Galligan during the evening of September 15, 1992 because her office had moved to Long Island. Nevertheless, Christian could easily have called the main FBI number in Manhattan and asked for Special Agent Galligan or the duty officer. He did not do so, however. Special Agent Galligan testified without contradiction that the FBI switchboard could have reached her at any time through her 24–hour beeper. Christian also had at least some opportunity at the train station in New York to phone the FBI, the DEA, or the police.[14]

It is Christian's own testimony about his intentions upon arriving in Baltimore, however, that dooms his duress defense. Upon arriving at the train station, Christian was alone and could have phoned the FBI, the DEA, or the Baltimore City Police Department. Any concern about corrupt police in the Bronx would have been irrelevant in Baltimore. Nevertheless, Christian testified that he had no intention of contacting law enforcement authorities and that he fully intended to participate in the Baltimore operation. Had he not been arrested at the railway station, the two murders would have been committed, Christian opined. His intent to persist in the murder-for-hire scheme, even though he was under no direct threat from Cox and despite several clear opportunities to escape or notify the authorities, negates, as a matter of law, Christian's professed duress defense.

Defendant relies primarily on *United States v. Contento–Pachon,* 723 F.2d 691 (9th Cir.1984). In *Contento–Pachon,* a passenger on a flight originating in Bogota, Columbia, was arrested at the Los Angeles airport after an x-ray of his abdomen revealed a foreign substance later determined to be 129 ballons of cocaine. *Id.* at 693. He claimed that he had been told that if he failed to carry the drugs or to follow instructions he and his family would be killed. *Id.* Further, he

---

**13.** Neither Christian nor his mother testified that Christian's family had been threatened by Cox.

**14.** Although Christian testified that he thought two men were watching him, he took no steps to evade them and reach a phone.

claimed that he failed to seek protection from the authorities in Bogota because he believed that the Bogota police were corrupt. *Id.* He also stated that he did not notify the authorities in Panama, where the plane stopped on route to Los Angeles, because he similarly believed that the Panamanian police were as corrupt as those in Bogota. *Id.*

In considering the duress defense, the Court of Appeals for the Ninth Circuit ruled that immediacy and escapability, the first and third elements of the duress defense, were issues for the trier of fact. The Ninth Circuit asserted that "[t]he trier of fact should decide whether one in Contento–Pachon's position might believe that some of the Bogota police were paid informants for drug traffickers and that reporting the matter to the police did not represent a reasonable opportunity of escape." *Id.* at 694.

This case, however, is not analogous to *Contento–Pachon.* First, neither Christian nor his mother testified that Cox had threatened any members of the Christian family. Thus, any implied threat was to Christian personally; his family was not held hostage and the threat to him dissipated when he personally was out of Cox's presence. Second, Christian had several opportunities to complain to law enforcement authorities in New York and Baltimore. Even if the Court accepts Christian's testimony that he could not expect help from the Bronx police, Christian does not claim that he lacked opportunity to seek the assistance of the DEA or the FBI once he arrived in Baltimore. Finally, unlike Contento–Pachon, Christian did not have to decide whether to trust the law enforcement agencies of a foreign country.

There is an additional fact that distinguishes *Contento–Pachon.* Christian believed that the two Baltimore drug dealers would be murdered unless he took steps to escape. By contrast, in *Contento–Pachon,* there was no identifiable, immediate victim of the drug smuggling. Christian had to weigh the implied threats to him against the planned deaths of the two men. Contento–Pachon, on the other hand, had to weigh the explicit threats to him and his family against the more remote, albeit real, harm to society

occasioned by the importation of another quantity of cocaine into the United States.

In sum, the Court holds that when a threatened person has legitimate opportunities to flee or to seek the assistance of the proper authorities as a means of avoiding the threatened harm to himself or to his family, he is required to avail himself of that opportunity. If he avoids doing so, as Christian has done in this case, he may not avail himself of the duress defense.

### III. ORDER

For the reasons stated above, the Court hereby DENIES defendant's motion to instruct the jury on the affirmative defense of duress. The Court shall inform the jurors that, while deliberating, they may not consider duress as a defense to the crimes charged in the superseding indictment.